[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 24, 2002
THOMAS K. KAHN
CLERK

No. 00-16138

D E Docket No. CR-01-83NE-44405

ALABAMA POWER COMPANY,
CAROLINA POWER & LIGHT COMPANY, et al.,

Petitioners,

versus

UNITED STATES DEPARTMENT OF ENERGY,
THE UNITED STATES OF AMERICA,

Respondents,

EXELON GENERATION COMPANY, LLC,

Intervenor.

Petition for Review of a Final Order of the
United States Department of Energy

**(September 24, 2002)**

Before TJOFLAT and BIRCH, Circuit Judges, and GOLDBERG*, Judge.

---

*Honorable George W. Goldberg, Judge, U.S. Court of International Trade, sitting by
designation.

TJOFLAT, Circuit Judge:

Pursuant to the Nuclear Waste Policy Act of 1982 ("NWPA"), 42 U.S.C. § 10101 et seq., the Department of Energy ("Department") contracted with operators of nuclear power plants to begin disposal of spent nuclear fuel ("SNF") "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B). It failed to do so. Hoping to stem the tide of litigation arising out of this massive breach, the Department entered into a settlement agreement with one utility, Exelon Generation Company ("Exelon"), in which the Department amended its contract with Exelon by giving it an "equitable adjustment" – in effect, an offset against future payments that Exelon (like all other utilities that produce nuclear waste) is obligated to pay into the Nuclear Waste Fund ("NWF").[1] The petitioners challenge this final agency action pursuant to the NWPA's judicial review provision, 42 U.S.C. § 10139. They contend that this "offset" is indistinguishable from a direct payment of NWF monies, and that such payments are unauthorized by law. We agree.

I.

What should be done with nuclear waste? Who should pay for its disposal? These were the central questions animating the NWPA. The legislation took a

---

[1]This amendment to the Standard Contract is hereinafter called "the Amendment."

large step toward answering these questions: the U.S. Government would take responsibility for disposing of the waste, and the utilities that produced the waste would bear the cost. The NWPA thus established a quid pro quo; the Government would provide a valuable service and utilities would pay money for this service. Rather than promulgating top-down legislation that would cover all of the intricacies of this arrangement, Congress authorized the Department to enter into contracts with energy firms. These contracts were to contain only a few statutorily required provisions, with the remainder to be established by the Department. The Department promulgated a "Standard Contract" through a notice-and-comment rulemaking proceeding. See 10 C.F.R. § 961.11. Important terms include the obligations of the Department and the reciprocal obligations of energy firms under the statute, both of which are discussed below. Also important are the remedial terms – an issue left untouched by the statute. Specifically, Article IX.A of the Standard Contract covers "unavoidable delays"; it provides that a party will not be liable under the contract if its failure to perform is not due to its fault. Id. If a delay is caused by something within the "reasonable control" of either party, then Article IX.B provides that "the charges and schedules specified by this contract will be equitably adjusted to reflect any additional estimated costs incurred by the party not responsible for or contributing to the delay." Id. Article XI, governing

remedies, states that "[n]othing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Id. Finally, Article XVI, entitled "Disputes," requires an internal dispute resolution procedure for "any dispute concerning a question of fact" under the contract. Id.

The NWPA provides that the entities owning and operating nuclear power plants, as generators and owners of nuclear waste, will pay the full cost of disposing of the waste. Under both the statute and the Standard Contract, holders of SNF must pay into the NWF, which serves as the financing vehicle for the nuclear waste disposal program. 42 U.S.C. § 10222; 10 C.F.R. § 961.11, art. VIII. "In paying such a fee, the person delivering spent fuel . . . to the Federal Government shall have no further financial obligation to the Federal Government for the long-term storage and permanent disposal of such spent fuel." 42 U.S.C. § 10222(a)(3). The NWF is the only source of funding that Congress identified in the NWPA for matters relating to the programs and policies established pursuant to the Act. The initial amount of the fee was set by both the statute and Standard Contract at 1.0 mil per kilowatt-hour. 42 U.S.C. § 10222(a)(2); 10 C.F.R. § 961.11, art. VII. To date, total payments into the NWF exceed $10.5 billion. See Department of Energy, Summary of Program and Budget Information as of December 31, 2000, tbl. 1-3.

4

Although the NWPA allows Congress to make appropriations to the NWF beyond those monies that the Standard Contract holders deposit into it, 42 U.S.C. § 10222(c)(2), the Act provides that the fees charged to the generators of SNF for permanent disposal should fully offset the costs of developing and operating such facilities, 42 U.S.C. § 10222(a)(4).  As previously noted, the original fee amount was set by statute (and the Standard Contract) at 1.0 mil per kilowatt-hour.  This initial assessment was to be only a starting point.  Because the NWPA expressly established the nuclear waste program on a full cost recovery basis, the Act requires that the NWF have neither too much nor too little to pay for the program costs.  Specifically, the Act requires the Secretary annually to review the ongoing fee amount to determine whether fee collections will result in either insufficient or excess revenues to cover the costs of the program.  Id.  If the Secretary determines that there will be either insufficient or excess revenues, the Secretary is required to propose to Congress "an adjustment to the fee to insure full cost recovery."  Id.  The Act, partially unconstitutional under INS v. Chada, 462 U.S. 919, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983),  states that "[t]he adjusted fee proposed by the Secretary shall be effective after a period of 90 days of continuous session have elapsed following the receipt of such transmittal unless during such 90-day period either House of Congress adopts a resolution disapproving the Secretary's

5

proposed adjustment." Id. No such change has ever been proposed by the Secretary, prompting the D.C. Circuit to observe that the Secretary, "not unlike Goldilocks, [always finds] that the statutory fee is not too high, and not too low, but just right." National Ass'n of Reg. Util. Commissioners ("NARUC") v. U.S. Dep't of Energy, 851 F.2d 1424, 1426 (D.C. Cir. 1988).

There is one statutorily required contractual provision that has been the source of much litigation: the Department's commitment to dispose of SNF beginning not later than January 31, 1998. Enacted in 1982, the NWPA gave the Department over fifteen years to select a repository site and begin permanent disposal – a much needed lead time in light of the arduous regulatory processes mandated by the NWPA in the name of science, safety, and cooperative federalism. After this date, the Department was obligated to begin its reciprocal obligation to dispose of the waste. See 42 U.S.C. § 10222(a)(5); 10 C.F.R. § 961.11. By 1995, the Department became certain that it could not meet its obligation. It announced that it had "become apparent that neither a repository nor an interim storage facility constructed under the Act will be available by 1998" and that the Department would not begin disposing of the SNF until 2010 at the earliest. Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21,793, 21,794 (May 3, 1995). What to do with all of that waste in the mean time? The

6

Department denied having any contractual or statutory obligation to dispose of SNF pending the construction and licensing of a permanent repository. Id. The Department further asserted that it was not authorized to accept, store, or dispose of SNF absent the existence of a permanent repository. Id. at 21,797. This interpretation of the NWPA was challenged in the D.C. Circuit, which found the Department's interpretation unreasonable and therefore not entitled to Chevron deference. Indiana Michigan Power Co. v. U.S. Dep't of Energy, 88 F.3d 1272 (D.C. Cir. 1996). The Department argued that the use of the word "dispose" in the statute presupposed the availability of a repository.[2] This is because the statutory definition of "disposal"—a form of the word "dispose" – was defined by the Act as "the emplacement in a repository of . . . spent nuclear fuel . . . with no foreseeable intent of recovery." 42 U.S.C. § 10101(9). Therefore, the Department argued, the Act contemplates that a repository be operational before the it becomes contractually obligated. The D.C. Circuit rejected this argument, holding that the ordinary meaning of the phrase "dispose of" does not presuppose the availability of a permanent repository. Indiana Michigan, 88 F.3d at 1275. The court concluded that the Department had an unconditional obligation to begin disposing of the

---

[2]The Act obligates the Department to "dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter." 42 U.S.C. § 10222(a)(4)(B).

7

utilities' SNF by January 31, 1998.  Id. at 1277.

After the D.C. Circuit vacated the Department's Final Interpretation, the Department responded by announcing yet again that it would be unable to begin acceptance of SNF and asserted that it had no financial responsibility for its failure to meet the deadline – this time contending that its delay was "unavoidable" within the meaning of Article IX.A of the Standard Contract.  Several utilities sought a writ of mandamus from the D.C. Circuit compelling the Department to comply with Indiana Michigan.  The D.C. Circuit, though sympathetic with the utilities, denied the requested relief, holding that the remedial scheme of the Standard Contract provided a "potentially adequate remedy" and therefore mandamus was inappropriate.  Northern States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754, 761 (D.C. Cir. 1997).  It neither ordered the Department to begin disposal nor relieved the utilities of their continued obligation to remit the 1.0 mil fee in accordance with the NWPA.  It did, however, issue a writ prohibiting the Department from characterizing its failure to meet the statutory deadline as an "unavoidable delay," characterizing the Department's use of Article IX.A as a recycled form of the "same argument . . . that it does not have responsibility for the costs resulting from its failure to perform" rejected by the Indiana Michigan court.  Id.

The Department continued to refrain from removing the SNF. Standard

Contract holders filed suit in the U.S. Court of Federal Claims, alleging breach of

contract, breach of a duty of good faith, and a taking in violation of the Fifth

Amendment. The Department responded that a suit for money damages in claims

court could not lie because the Standard Contract triggered an exclusive remedy for

utilities – namely, equitable adjustment of the 1.0 mil fee as established under the

agency's internal dispute resolution scheme.[3] The Federal Circuit rejected this

argument. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336

(Fed. Cir. 2000). The court reasoned:

> The provision is not a general one covering all delays, but a more limited one dealing with specified kinds of delays, namely, those "in the delivery, acceptance or transport" of nuclear waste. These involve particular delays involving individual contractors. They are not the kind of delays that routinely may arise during the performance of the contract. For them to arise, however, the parties must have begun performance of their obligations relating to disposal of nuclear waste.

Id. at 1341.

Since the clause was inapplicable, this meant that the contract did not

---

[3]At first blush, it appears that the Department's defense was only procedural; it argued that the dispute should be resolved according to the dispute resolution procedures set out in Article XVI of the Standard Contract. It is clear from reading the Federal Circuit's opinion, however, that the court thought Article XVI and Article IX.B were inextricably linked. That is, the court interpreted the equitable adjustment provision as existing in unison with the procedural mechanism. Indeed, it was the equitable adjustment provision that was held to be inadequate, leaving the utilities free to sue in the claims court rather than resorting to the internal dispute resolution scheme of the Standard Contract.

provide for the complete "relief necessary adequately to compensate Yankee for the damages it alleges it suffered from the government's breach of the contract." Id. at 1342. This left the utilities free to seek ordinary money damages in the claims court. Query: how could the Federal Circuit jettison the equitable adjustment remedy of Article IX.B when the D.C. Circuit pointed directly to that remedy as a "potentially adequate" alternative sufficient to make mandamus improper? To this the Federal Circuit responded:

> The [D.C. Circuit's] statements were all made in explaining why mandamus would not be appropriate, because the petitioners had "another potentially adequate remedy," namely, the scheme the Standard Contract provided "for dealing with delayed performance." The [D.C. Circuit] twice characterized that remedy as "potentially adequate," and that was sufficient to deny mandamus.
> The court did not focus on or address the issue presented here – whether the presence of the contractual administrative dispute resolution provisions precludes the present suit for breach of contract. The court's concern was whether there was an alternative potential remedy available that made mandamus inappropriate; it held that there was. It was not required to, and did not determine the precise scope of that remedy. As the Court of Federal Claims stated in rejecting the government's similar argument, "it was simply the existence of those remedies as opposed to any determination regarding the completeness of the relief they afforded that explains the D.C. Circuit's decision."

Northern States Power Co. v. United States, 224 F.3d 1361, 1366 (Fed. Cir. 2000) (internal citations omitted).

Just before the Federal Circuit rendered its decisions in Maine Yankee and Northern States Power, the Department sought to negotiate settlement agreements

10

that would allow those Standard Contract holders willing to give up their breach of contract claims to recoup from the NWF some of the costs incurred as a result of the Department's default. On July 19, 2000, the Department and Exelon entered into an agreement in which Exelon agreed to forfeit its contract claim in exchange for credits against the on-going 1.0 mil per kilowatt-hour payments that Exelon would otherwise be obligated to pay into the NWF. This credit arrangement came in the form of an amendment to Exelon's original Standard Contract.[4] The Department has announced that it will use the Amendment as a settlement model on an industry-wide basis. Hoping to prevent the widespread use of this sort of agreement, various energy firms have challenged the Amendment's validity by arguing that it is not an authorized use of NWF monies.

---

[4]Because the agreement was entered into after the D.C. Circuit decisions but before the Federal Circuit decisions were rendered, the parties were perhaps misled into believing that the "avoidable delays" provision of Article IX was the appropriate starting point for settlement negotiations. The "recitals" section of the Amendment states in pertinent part:

> Whereas, the U.S. Court of Appeals for the District of Columbia Circuit held in Northern States Power Co. v. United States Department of Energy, 128 F.3d 754 (D.C. Cir. 1997), cert. denied, 119 S. Ct. 540 (1998), that DOE's delay was avoidable, and therefore, [Exelon] would be entitled to pursue a request for equitable adjustment against the United States pursuant to Article IX.B of the [Standard] Contract, which expressly allows DOE to adjust charges and schedules to address issues arising from avoidable delays.

As discussed in the text, the Federal Circuit foreclosed the equitable adjustment remedy of Article IX.B as an option, holding that the clause did not apply to the Department's large-scale breach. This holding does not, of itself, make the settlement agreement void; the parties are free to enter into any agreement that is legally authorized. Whether the agreement is, in fact, authorized by law is the question raised in this petition.

11

II.

A.

Before we analyze the standing and ripeness issues in this case, we must first

determine the Secretary's fee-adjustment duties under the statute[5] in light of the

Supreme Court's decision in INS v. Chada, 462 U.S. 919, 103 S. Ct. 2764, 77 L.

Ed. 2d 317 (1983).  Two options are presented.  First, we could strike down the

section in its entirety.  This would leave in place the 1.0 mil per kilowatt-hour fee

as the statutory requirement, totally immune from administrative alteration.

Second, we could strike down only the word "unless" and all of the language

following that word.  Our inquiry boils down to the likely legislative intent.  See

_____

[5]The relevant part of the NWPA provides:

Not later than 180 days after January 7, 1983, the Secretary shall establish
procedures for the collection and payment of the fees established by paragraph (2)
and paragraph (3).  The Secretary shall annually review the amount of the fees
established by paragraphs (2) and (3) above to evaluate whether collection of the fee
will provide sufficient revenues to offset the costs as defined in subsection (d) of this
section.  In the event the Secretary determines that either insufficient or excess
revenues are being collected, in order to recover the costs incurred by the Federal
Government that are specified in subsection (d) of this section, the Secretary shall
propose an adjustment to the fee to insure full cost recovery.  The Secretary shall
immediately transmit this proposal for such an adjustment to Congress. The adjusted
fee proposed by the Secretary shall be effective after a period of 90 days of
continuous session have elapsed following the receipt of such transmittal *unless
during such 90-day period either House of Congress adopts a resolution
disapproving the Secretary's proposed adjustment in accordance with the
procedures set forth for congressional review of an energy action under section 6421
of this title*.

42 U.S.C. § 10222(a)(4) (emphasis added).

Buckley v. Valeo, 424 U.S. 1, 108, 96 S. Ct. 612, 677, 46 L. Ed. 2d 659 (1976) (holding that invalid portions of a statute are to be severed "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not"). If we were to conclude that Congress would rather set the fee itself rather than give the Secretary unfettered administrative discretion to alter it, we would take the first option.[6] If we were to conclude that Congress would rather give the Secretary full discretion to alter the fee in the event that the legislative veto provision is invalidated, we would take the second option. We think the second option is best.[7]

The Chada Court considered an almost identical provision in the Immigration and Nationality Act, 8 U.S.C. § 1252, which allowed the Attorney General to suspend the deportation orders of immigration judges. Upon such suspension, the Attorney General was required to make a "complete and detailed

---

[6]This option would preclude the petitioners from having standing in this case, because there would be no nexus between the allegedly unauthorized expenditure of NWF monies and a subsequent increase or decrease in the fee. The fee would remain at 1.0 per kilowatt-hour absent a change by Congress via ordinary legislation.

[7]This means that after the appropriate language is invalidated, the statute creates a "report and wait" requirement, approved by the court in Chada and Sibbach v. Wilson, 312 U.S. 1, 61 S. Ct. 442, 85 L. Ed. 479 (1941). The Secretary has a duty to submit a proposal to Congress, and this proposal becomes effective after 90 days of continuous session have elapsed following the submission unless Congress trumps the Secretary's proposal by ordinary legislation meeting the requirements of presentment and bicameralism. This result mirrors precisely that result reached in Chada.

13

statement of the facts and pertinent provisions of law in the case" to Congress. Congress then had the power under section 244(c)(2) of the Act, 8 U.S.C. § 1254(c)(2), to veto the Attorney General's determination that the immigrant should not be deported. Like the decision of the Secretary of Energy in the present case, the decision of the Attorney General served as the default rule after a certain period of time elapsed, trumped only by a one-House veto by either chamber of Congress within the relevant time period.

Pointing to the severability clause in the Act, the Court held that the provision was "unambiguous" and "gives rise to a presumption that Congress did not intend the validity of the Act as a whole, or any part of the Act, to depend upon whether the veto clause of § 244(c)(2) was invalid." Chada, 462 U.S. at 932, 103 S. Ct. at 2774 (emphasis added). The presumption raised by a severability clause, then, is that Congress desires to save as much of the Act as possible. Our task in this case is therefore greatly eased by the existence of a severability clause. See 42 U.S.C. § 10102 ("If any provision of this chapter, or the application of such provision to any person or circumstance, is held invalid, the remainder of this chapter, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby."). Even absent a severability clause, the Court has asserted that "whenever an act of Congress

14

contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684, 107 S. Ct. 1476, 1479, 94 L. Ed. 2d 661 (1987) (citations omitted).

A provision is further presumed severable if what remains after severance "is fully operative as a law." Champlin Refining Co. v. Corporation Comm'n, 286 U.S. 210, 234, 52 S. Ct. 559, 565, 76 L. Ed. 1062 (1932). In Chada, the Court observed that

> the administrative process enacted by Congress authorizes the Attorney General to suspend an alien's deportation under § 244(a). Congress' oversight of the exercise of this delegated authority is preserved since all such suspensions will continue to be reported to it . . . . Clearly, § 244 survives as a workable administrative mechanism without the one-House veto.

Chada, 462 U.S. at 934-35, 103 S. Ct. at 2775–76. The same thing can be said in the present case. Through the reporting requirement, Congress will still have the ability to keep tabs on the Secretary's use of administrative discretion. The statutory scheme will continue to function if that singular clause in the sentence is struck down.

These presumptions lead us to the conclusion that only the "unless" clause should be invalidated. This is so even if the existence of the one-House veto evinces some hesitance on the part of Congress to grant unfettered authority to the

15

Secretary. The Supreme Court made a similar conclusion in <u>Chada</u>: "Although it may be that Congress was reluctant to delegate final authority over cancellation of deportations, such reluctance is not sufficient to overcome the presumption of severability raised by § 406." <u>Chada</u>, 462 U.S. at 932, 103 S. Ct. at 2774. Indeed, administrative flexibility best comports with the overall statutory scheme. Because Congress wanted to ensure that the NWPA would be funded on a cost-recovery basis, it probably wanted fees to be adjusted in the most responsive way. If the political inertia required for full blown bicamerialism and presentment were required, the resulting lag might be large enough to make the NWF grossly over- or under-funded.

## B.

Before Article III authorizes a court to decide a case, there must be a justiciable case or controversy. "Perhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement is that of standing." <u>Wooden v. Bd. of Regents of the Univ. Sys. of Ga.</u>, 247 F.3d 1262, 1273 (11th Cir. 2001). The courts have an independent obligation to examine their own jurisdiction before proceeding to the merits of a claim. <u>Region 8 Forest Serv. Timber Purchasers Council v. Alcock</u>, 993 F.2d 800, 807 n.9 (11th Cir. 1993). "Standing doctrines are employed to refuse to determine the merits of a legal

claim, on the ground that even though the claim may be correct, the litigant advancing it is not properly situated to be entitled to its judicial determination." 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3531, at 338-39 (1984). In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992), the Court held that to satisfy Article III's standing requirements, a plaintiff must show that (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to [conduct] of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. See also Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc., 528 U.S. 167, 180, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000).

The Department contends that the petitioners are not "injured." Noting the petitioners' precarious position as non-parties to the settlement agreement, the Department argues that any downward or upward adjustment of the fee is speculative at best. Instead of challenging its allegedly unauthorized expenditures, it says, the utilities should await a final decision by the Department that alters the ongoing fee requirements. We disagree. Because the NWF is designed to collect all of the costs for disposing of SNF, any shortfall in the Nuclear Waste Fund

17

caused by the Amendment would have to be made up by fees paid by other Standard Contract holders.  The net effect of the settlement is that the petitioners will have to pay more fees into the NWF to compensate for the allegedly unauthorized expenditures that the Department has given Exelon.  Alternatively, if there were to be excess dollars in the NWF, the petitioners would be deprived of the reductions in the one mil fee that would otherwise ensue.  In either circumstance, they will be forced to pay for the damages resulting from the Department's breach of its contract with Exelon.  The Department points out that no adjustment of the ongoing fees is automatic, even if the Secretary were to propose one.  After all, the statute still requires the Secretary to report to Congress, which might alter the fee adjustment through ordinary legislation.  But this argument proves too much: Congress could always alter an agency's statutory requirement through ordinary legislation.  If the Department's argument were correct, nobody would ever have standing to challenge an agency's actions.  We do not think it is significant that the NWPA requires a report to Congress.

We can understand the Department's attempt to force petitioners to bring a suit challenging the inevitable fee increase (or failure to decrease) directly rather than challenging particular unauthorized expenditures.  Given the nebulous calculations that must be made in order to assess the costs of waste storage that

18

will be incurred in the distant future, it is not surprising that the statutory fee has never been challenged by the utilities. They would face an insurmountable burden of proof. By shifting particular challenges to its expenditures into the rubric of a larger challenge to the fee, the Department could effectively insulate its expenditures from challenge. It could, for example, get away with purchasing a fleet of yachts for its staff out of NWF monies with virtual impunity. The standing doctrine does not countenance such a result.

Given the zero-sum nature of the Fund and our reading of the statute in light of Chada, we are confident that any unauthorized expenditures would automatically raid the Fund of monies that would otherwise be used to fund authorized expenditures (which must be paid for with yet more fees) or reimburse the utilities.[8] The Amendment will cause an injury, injury is imminent, and the injury will be redressed by precluding the Department from expending NWF monies in this way.

---

[8]This is so even if Congress decides to appropriate more money into the NWF. In the event that an unauthorized expenditure injures the utilities by raiding the NWF of money that would otherwise be used to reimbursement them, additional money appropriated by Congress would only make the reimbursement that much larger. It would, in short, leave unaffected the conclusion that some sort of reimbursement is required. In the event that an unauthorized expenditure causes injury by raiding the NWF of money that would otherwise be used to pay for authorized expenditures (thus creating a shortfall and subsequent requirement that the Secretary raise the fee to make up for the shortfall), additional money appropriated by Congress would not change the fact that fewer expenditures would require still smaller fees.

C.

Exelon and the Department argue that the petitioners' claim is not ripe for review. The purpose of the ripeness doctrine is summarized in Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967):

> [The] basic rationale [of the doctrine] is to prevent the courts, though avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

Id. at 148-49, 87 S. Ct. at 1515. Exelon and the Department basically recycle their standing arguments under the heading of "ripeness,"[9] so we will not restate them here. In deciding whether a case is ripe, we look primarily at two considerations:

---

[9]This is understandable given the affinity between the two doctrines. As one commentator explains:

> While standing is concerned with who is a proper party to litigate a particular matter, ripeness and mootness determine when that litigation may occur. Specifically, the ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and never may occur, from those cases that are appropriate for federal court action.
>    Although the phrasing makes the questions of who may sue and when may they sue seem distinct, in practice there is an obvious overlap between the doctrines of standing and ripeness. If no injury has occurred, the plaintiff might be denied standing or the case might be dismissed as not ripe.

Erwin Chemerinsky, Federal Jurisdiction § 2.4.1 (3d ed. 1999) (internal footnote omitted)

20

"the hardship to the parties of withholding court consideration" and "the fitness of the issues for judicial decision." Id. at 149, 87 S. Ct. at 1515. As we discussed in part II.A, the future harm is certain, not speculative. If we force the petitioners to postpone review until the Secretary increases (or fails to increase) the fee, the parties will face a much more difficult burden in establishing the extent of their injury. We think this unattractive alternative creates a hardship sufficient to enjoin any unauthorized expenditures now rather than in the context of litigation over the fee. The issue is also fit for judicial resolution. The question is "purely legal," and we do not fear that a decision will be tantamount to "entangling [ourselves] in abstract disagreements over administrative policies." Id. at 148, 87 S. Ct. at 1515. In short, this case falls squarely within that range of cases normally found to be ripe – namely, cases that "present either or both of two features: significant present injuries . . . or legal questions that do not depend for their resolution on an extensive factual background." Laurence Tribe, American Constitutional Law 80 (2d ed. 1987).

We find National Association of Regulatory Utility Commissioners v. Department of Energy ("NARUC"), 851 F.2d 1424 (D.C. Cir. 1988), distinguishable. In that case, the petitioners challenged a "Notice" published in the Federal Register in which the Department of Energy tentatively established a

21

method for allocating the costs of developing, constructing, and operating nuclear waste repositories between the government and commercial producers of such waste. First, the court held that the methodology had yet to be applied to anybody, leaving the court to conclude that its "deliberations might benefit from letting the question arise in some more concrete and final form." NARUC, 851 F.2d at 1429 (citations omitted). In this case, by contrast, the settlement agreement has already been made. We would scarcely benefit from additional facts. Second, the court found that the claims "may well prove to be no more than theoretical when petitioners revisit them in the context of a concrete application." Id. at 1429. It is clear that judicial intervention will be required to save the petitioners from injury in this case. Finally, the court held that there was no hardship to the parties: "Any injury they allege is a hypothetical future injury owing to the Department's expected use of the methodology in its 1988 Report, not a present hardship resulting from the Notice itself." Id. In the present case, the Department has already done the damage by entering into the unlawful settlement agreement.[10]

## D.

Exelon argues that in light of the Northern States Power's holding that the

---

[10]One can see how ripeness doctrine overlaps with yet another doctrine: finality. *See* 16 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3942 (2d ed. 1996).

utilities must pursue the remedies provided in the Standard Contract, and as a general proposition of administrative law, the availability of a potential suit in the Court of Federal Claims under the Tucker Act precludes an administrative challenge to the Department's action. See, e.g., Brazos Electric Power Coop., Inc., v. United States, 144 F.3d 784, 788 (Fed. Cir. 1998) (holding that suit under the APA is precluded where "[a] suit in the Court of Federal Claims pursuant to the Tucker Act provides [plaintiff] with an adequate remedy for its grievance"). If and when any particular petitioner suffers the complained-of harm (e.g., an increase in fees), the Department argues, there is nothing to preclude that petitioner from asserting in the court of claims that the Secretary has breached the "full cost recovery" contractual provision by improperly adjusting the fees. As we stated in the standing context, we think that a subsequent suit challenging the Secretary's nebulous predictions of future costs would be extremely difficult to maintain, and therefore provides an inadequate alternative remedy. Both justice and judicial economy dictate that we stop any unauthorized expenditures at this stage.

### E.

The Department argues that any challenge to its right to make equitable adjustments is untimely, because the real "final decision" being challenged is the equitable adjustment provision (Article IX.B) itself – a provision that became

23

subject to judicial review in 1983 when it became part of the Standard Contract and was published in the Federal Register. Accordingly, the petitioners should have brought a challenge within 180 days after that action pursuant to 42 U.S.C. § 10139(c). The petitioners, however, do not challenge the facial validity of the equitable adjustments provision. Rather, they challenge a particular settlement agreement that allegedly embodies an unlawful expenditure of NWF monies. It is that agency action, not the 1983 Standard Contract, that is being challenged. Although this case does not raise ripeness or standing concerns, a hypothetical challenge brought in 1983 – completely lacking in factual context and devoid of any real harm to the petitioners – certainly would.

III.

A.

When the Department granted Exelon an offset against the fees it would otherwise be required to pay into the NWF, this action was tantamount to an expenditure of NWF dollars on what the offset was effectively funding – namely, Exelon's continued interim storage costs incurred as a result of the Department's breach. Put differently, one option was for the Department to settle its breach of contract liabilities by paying money out of the NWF and continue charging all utilities the same fee as it always had. Another option was to make this exchange

24

in a single transaction by giving any settling utility an offset against its fees as they become due. The Department has taken the latter option, but it should be examined no differently from an expenditure of NWF monies. See, e.g., Harrold v. Comm'r of Internal Revenue, 232 F.2d 527, 529 (9th Cir. 1956) ("In law, payment may just as effectively be made by offset or credit."). This common sense intuition is confirmed by the language the Department has used in describing the Amendment. In the Amendment itself, for example, the Department characterizes the credits awarded to Exelon as "reimbursement by DOE" of Exelon's on-site SNF storage costs resulting from the Department's breach of contract. Moreover, Exelon is obligated to "reimburse the Nuclear Waste Fund" in the event that it receives reimbursement for its storage expenses from an alternative funding source, indicating that the credits were seen as a substitute for a direct expenditure of NWF monies. The question, then, is whether such a payment is authorized by the NWPA.

The level of deference we are to give to the Department's legal interpretation is unclear. Our starting point in reviewing an administrative agency's interpretation of a statute that it administers is Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) . The Court held:

25

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation . . . . In such a case, a court may not substitute its own construction . . . for a reasonable interpretation made by the administrator of an agency.

Id. at 843-44, 104 S. Ct. at 2781-82 (internal footnote omitted).

The Chevron doctrine has been complicated in recent years by the Court's decision in United States v. Mead Corp., 533 U.S. 218, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001), which held that only certain embodiments of agency interpretations are to be given Chevron deference–i.e., those interpretations found in an "administrative action with the effect of law." Id. at 230, 121 S. Ct. at 2172. Such interpretations are typically pronouncements with "a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." Id. Although the Court has granted Chevron deference even when no administrative formality was required, id. at 230-31, 121 S. Ct. at 2173, the settlement agreement in this case, like the "classification rulings" in Mead, "present a case far removed not only from notice-and-comment process, but from any other circumstances reasonably suggesting that Congress ever thought [there should be deference]." Id.

Using traditional tools of statutory construction, we find that the NWPA

26

clearly does not allow the Department to utilize NWF monies to pay for the interim storage costs of the Department's contract creditors. Thus, even if Chevron deference does apply, the Department's interpretation is not saved. We therefore do not have to reach the thorny question as to whether the challenged interpretation of the NWPA is embodied by Article IX.B of the Standard Contract (which became effective pursuant to the APA's notice-and-comment rulemaking procedures) or the Amendment (which is "far removed" from any circumstances suggesting that Congress thought such settlement agreements deserve deference). Whether or not the agency is entitled to Chevron deference, its interpretation cannot be the law.

We arrive at our conclusion for several reasons. First, the statute provides that the Secretary "may make expenditures from the Waste Fund . . . only for purposes of radioactive waste disposal activities under subchapters I and II of this chapter." 42 U.S.C. § 10222(d) (emphasis added). An expenditure on interim storage is not an act of "disposal." Rather, payments the Department makes for on-site storage is the opposite of "disposing" of the waste.

The Act makes a list of things that might be considered acts of "disposal."[11]

_____

[11]These activities include:

(1) the identification, development, licensing, construction, operation, decommissioning, and post-decommissioning maintenance and monitoring of any

27

Although the list is not exhaustive,[12] it is instructive of the kinds of activities that might be characterized as "disposal." The items in the list all have one thing in common: they entail some sort of advancement or step toward permanent disposal, or else an incidental cost of maintaining a repository. None of them encompass the maintenance of the status quo. To be sure, the D.C. Circuit did give broad meaning to the term "dispose" in Indiana Michigan, construing the term to mean more than "the emplacement in a repository of spent nuclear fuel with no foreseeable intent of recovery" as the statutory definition of "disposal", 42 U.S. C. § 10101(9), might have one believe. Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272,

repository, monitored, retrievable storage facility or test and evaluation facility constructed under this chapter;

(2) the conducting of nongeneric research, development, and demonstration activities under this chapter;

(3) the administrative cost of the radioactive waste disposal program;

(4) any costs that may be incurred by the Secretary in connection with the transportation, treating, or packaging of spent nuclear fuel or high-level radioactive waste to be disposed of in a repository, to be stored in a monitored, retrievable storage site or to be sued in a test and evaluation facility;

(5) the costs associated with acquisition, design, modification, replacement, operation, and construction of facilities at a repository site, a monitored, retrievable storage site or a test and evaluation facility site and necessary or incident to such repository, monitored, retrievable storage facility or test and evaluation facility; and

(6) the provision of assistance to States, units of general local government, and Indian tribes under sections 10136, 10138, and 10199 of this title.

42 U.S.C. § 10222(d).

[12]The petitioners rely too heavily on Nevada v. Herrington, 777 F.2d 529 (9th Cir. 1985), and the statutory list. They argue that since on-site storage is not found in the list, it is an unlawful expenditure per se. The list is not exhaustive, and so this argument must be rejected. The list in Herrington, by contrast, was exhaustive. As we discuss in the text, however, the items in the list do inform our understanding of what "disposal" means.

28

1275 (D.C. Cir. 1996). But the court adhered to the ordinary meaning of that term. Id. ("Webster's Third New International Dictionary Unabridged 654 (1961) defines [dispose] as meaning, among other things, 'to get id of; throw away; discard.'"). Payments for the purpose of interim storage costs simply are not payments for "disposal." Indeed, the Department itself once disavowed any authority to utilize the NWF to compensate plant owners for additional storage costs at reactor sites caused by the Department's delay. See Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21,793, 21,797 (May 3, 1995).

Our interpretation is confirmed by the Interim Storage Fund provisions in the Act. See 42 U.S.C. § 10156. The NWPA expressly requires additional storage capacity provided by the Department at reactor sites to be funded from a separate Interim Storage Fund, financed by those utilities receiving the benefits of the additional storage capacity. Congress clearly contemplated interim storage costs when it enacted this provision. Therefore, the NWF cannot be used as a separate source of funding for interim storage costs. This conclusion is not unlike that reached by the Department in its Final Interpretation. See 60 Fed. Reg. at 21,797 ("Because these are the only interim storage authorities provided by the Act, and because the Act expressly forbids use of the Nuclear Waste Fund to construct or expand any facility without express congressional authorization . . . , DOE lacks

authority under the Act to provide interim storage services under present circumstances.").

Our conclusion is further reinforced by common sense and a practical understanding of the regulatory scheme Congress envisioned. If the Department could pay for its breach out of a fund paid for by the utilities, the government would never be liable. Instead, the Department would keep adding these liabilities as "costs" that would justify future fee increases, indirectly forcing the utilities to bear the costs of the Department's breach. This is certainly not what Congress had in mind when it decided to empower the Department to negotiate contracts rather than imposing top-down regulations. Moreover, those utilities who neither settle nor litigate their claims would end up paying greater fees to cover the costs of other utilities. This thwarts the quid pro quo arrangement in which each utility roughly pays the costs of disposing of its waste and no more (using kilowatt-hours as a proxy for waste production). By establishing a contract and a quid pro quo arrangement, the regulatory scheme contemplates that the ultimate burden of the government's breach to fall on the government, not other utilities.

The Department's response is that a judgment cannot be paid out of the general Judgment Fund, see 31 U.S.C. § 1304. Since the NWF is the only source of funding for the NWPA, it argues, surely the NWF can be used to satisfy court

judgments and pay settlements. This argument is mistaken. First, if the Department is right that the Judgment Fund cannot be used to satisfy a judgment, this does not mean that the NWF a priori becomes available. Rather, the claimants or the Department would have to look to Congress to appropriate money for that purpose. Second, we are skeptical that the Judgment Fund is unavailable. The Judgment Fund provision states that "Necessary amounts are appropriated to pay final judgments, awards, [and] compromise settlements . . . when . . . payment is not otherwise provided for . . . and the judgment is payable under [a variety of other statutes, including 28 U.S.C. § 2517]." 31 U.S.C. § 1304(a). Section 2517, in turn, provides that "[e]xcept as provided by the Contract Disputes Act of 1978, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor." 28 U.S.C. § 2517. As the language of these statutes indicates, most every judgment under the Tucker Act is payable under either the Judgment Fund or some other specific appropriation. It is, of course, hornbook law that Tucker Act jurisdiction can only be exercised over cases in which appropriated funds can be obligated. See, e.g., L'Enfant Plaza Properties, Inc. v. United States, 668 F.2d 1211, 1212 (Ct. Cl. 1982). This rule creates a pocket of cases in which the claims court lacks jurisdiction because the defendant is a "non-appropriated fund agency." Id. The

U.S. Court of Claims held:

> There must be a clear expression by Congress that the agency was to be separated from general federal revenues. Congress must have intended the activity resulting in the claim was not to receive or be funded from appropriated funds. To sustain jurisdiction here, the requirement is not that appropriated funds have been used for the activity but that under the agency's authorizing legislation <u>Congress could appropriate funds if necessary</u>. Jurisdiction under the Tucker Act must be exercised absent a firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts of the Comptroller.

<u>Id.</u> (citations omitted) (emphasis added). The Federal Circuit recently reasserted the same point in <u>Furash & Co. v. United States</u>, 252 F.3d 1336 (Fed. Cir. 2001): "Under the test set forth in <u>L'Enfant Plaza</u>, what matters is whether the agency's authorizing legislation makes clear that Congress intends for the agency – or the particular activity that gave rise to the dispute in question – to be separated from general federal revenues." <u>Id.</u> at 1340. There is no such clear statement in the NWPA. To the contrary, the Act specifically contemplates appropriations by Congress. <u>See</u> 42 U.S.C. § 10222(c)(2).

If we were to accept the Department's argument, we would be forced to flout the series of decisions giving rise to the present litigation. Assume that, as the Department contends, a power plant cannot obtain satisfaction of a claims court money judgment for breach of contract or an unconstitutional taking from funds appropriated by Congress for the satisfaction of a claims court judgment. If that is

32

so, the Department can defy with impunity the D.C. Circuit's decision in <u>Northen States Power</u> in that it could forever delay the implementation of the program. It could simply require utilities to store the waste forever – all at the utilities' expense.

The Department's response to this ridiculous result is that, yes, the utilities can obtain a claims court judgment, because it can be satisfied out of the NWF. This is pure sophistry. Since the utilities have to fund "the Fund," they, not the government, would have to satisfy the judgments they obtain. One can imagine what the Federal Circuit would have said in response to the Department's argument. Had the court accepted the argument (while at the same time telling the utilities they could sue in the court of claims and obtain a money judgment), the court itself would have become the fool.

We do not think a proper reading of Federal Circuit's decisions in <u>Maine Yankee</u> and <u>Northern States Power</u> will permit such a result. The court held that the remedial scheme in the contract was inadequate and so the suit in claims court could be brought. <u>Maine Yankee Atomic Power Co. v. Unites States</u>, 225 F.3d 1336, 1342 (Fed. Cir. 2000). The implication is that since an equitable adjustment was not adequate, a more adequate remedy must be available. What remedy? It must have been money damages and not a mere equitable adjustment. Assuming

33

that money damages from the NWF and a reduction in the required future contributions to the NWF are the same thing, the court must have assumed that there was another appropriation for this money – likely out of the Judgment Fund.

B.

The Amendment not only violates the statute by permitting an unauthorized expenditure, it also exceeds the Department's statutory authority to adjust the fee. This is because the statute requires a <u>universal</u> fee, and that adjustments be <u>reported</u> to Congress before taking effect. 42 U.S.C. § 10222(a)(2)-(4). There is no other mechanism for changing the 1.0 mil per kilowatt-hour fee. The Amendment is thus an attempt by the Secretary to (a) adjust the fee with regard to a particular utility (not universally) and (b) make this adjustment without reporting to Congress. This it cannot do.

C.

Both parties point to potential constitutional issues lurking in the background – issues they argue could be avoided if we construe the NWPA one way or the other. Where an otherwise acceptable construction of a statute would raise serious constitutional problems, the court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. <u>N.L.R.B. v. Catholic Bishop of Chicago</u>, 440 U.S. 490, 499-501, 504,

34

99 S. Ct. 1313, 1318-19, 1320-21, 59 L. Ed. 2d 533 (1979). This canon trumps

Chevron deference when the two are in tension. See Edward J. DeBartolo Corp. v.

Florida Gulf Coast Bldg.& Const. Trades Council, 485 U.S. 568, 574-76, 108 S.

Ct. 1392, 1397-98, 99 L. Ed. 2d 645 (1988). We agree that if the statute were

construed to make utilities contribute to a fund that disproportionately pays the

storage costs of other utilities – a cost incurred because of the Department's breach

– this would raise a serious Fifth Amendment takings question. Exelon counters

with a constitutional issue of its own. It contends that by prohibiting the

Amendment, we will necessarily have to reach the serious constitutional issue of

how much of the statute remains after Chada. We think, however, that any

"question" raised by Chada is in no sense "serious"; all agree that the legislative

veto is unconstitutional, and the severability question reached in part I.A was not a

close one. Moreover, we would have had to reach the question in any event

because it was an integral part of the standing and ripeness issues.[13] Finally, the

Department's construction is plainly contrary to the intent of Congress.

IV.

In conclusion, we first hold that the legislative veto provision of 42 U.S.C. §

---

[13]The Chada Court similarly had to address the severability issue before reaching the standing issue. INS v. Chada, 462 U.S. 919, 931-36, 103 S. Ct. 2764, 2774-76, 77 L. Ed. 2d 317 (1982).

10222(a)(4) is unconstitutional and that the entire provision is saved except the clause in the last sentence beginning with the word "unless." We also hold that the Department of Energy is not authorized by law to spend NWF monies on settlement agreements aimed at compensating utilities for their on-site storage costs as a result of the Department's massive breach. Even if we were forced to grant Chevron deference to the Department – an unlikely scenario in light of Mead and DeBartolo – we find the Department's interpretation unreasonable and the statute unambiguous. The Department cannot circumvent the statutory limitation on eligible sources of NWF expenditures indirectly by reducing Exelon's NWF contributions in order to "offset" Exelon's storage costs. Accordingly, we declare the fee adjustment provided by the Amendment null and void.

SO ORDERED.