[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12304
_____

D.C. Docket No. 9:15-cv-80484-RLR


NEXTERA ENERGY, INC.,
and Affiliated Subsidiaries
f.k.a. FPL Group, Inc.,
FLORIDA POWER & LIGHT COMPANY,
separately and as parent of Florida Power & Light Company
and Affiliated Subsidiaries,

                                                    Plaintiffs - Appellants,

versus

UNITED STATES OF AMERICA,

                                                    Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 28, 2018)

Before MARTIN, JULIE CARNES, and GILMAN,[*] Circuit Judges.

MARTIN, Circuit Judge:

Plaintiff NextEra Energy, Inc., and its subsidiaries Florida Power & Light Company and NextEra Energy Resources, LLC (collectively "NextEra") operate five nuclear power plants.  NextEra seeks a sizeable tax refund for net operating losses resulting from fees it paid to the Nuclear Waste Fund for the disposal of radioactive waste.  The District Court denied NextEra's claims and granted summary judgment in favor of the United States.  After careful review, and with the benefit of oral argument, we affirm.

## I.  BACKGROUND

A.    THE FACTS

NextEra operates two nuclear power plants in Florida and one each in Iowa, New Hampshire, and Wisconsin.  All five plants are now in operation.

Nuclear reactors are generally powered by hundreds of "fuel assemblies" that contain rods of enriched uranium.  In the core of the reactor, these rods undergo a sustained nuclear fission reaction.  This fission reaction produces heat, which creates steam to rotate turbines.  The rotation of the turbines generates electricity.  Over time, fuel assemblies become less efficient in producing energy,

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

so they need to be replaced.[1]  Used fuel assemblies continue to emit dangerous radiation for thousands of years.

Spent nuclear fuel can be stored on-site for years, but ultimately needs to be transferred to a permanent storage site.  See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 195–96, 103 S. Ct. 1713, 1717–18 (1983) (detailing pileup of temporarily stored spent nuclear fuel and possibility that reactors will shut down due to lack of on-site storage space); New York v. Nuclear Regulatory Comm'n, 681 F.3d 471, 474 (D.C. Cir. 2012) ("[On-site] storage, optimistically labeled 'temporary storage,' has been used for decades longer than originally anticipated.").

B.    GOVERNING STATUTES AND REGULATIONS

1.    Commissioning and Decommissioning a Nuclear Power Plant

The Atomic Energy Act authorizes the Nuclear Regulatory Commission ("NRC") to issue licenses for the operation of nuclear power plants.  42 U.S.C. § 2131.  Those licensed to run nuclear power plants must adhere to strict regulatory guidelines promulgated by the NRC.  See id. § 2133(a), (b).  For example, the NRC will not terminate a license until a nuclear facility is free of radioactive contamination.  See 10 C.F.R. § 50.2 ("Decommission means to remove a facility

---

[1] It was initially believed that spent nuclear fuel could be reprocessed and used again. However, "expectations for reprocessing remained unfulfilled," and current operational plans require storage and disposal of spent nuclear fuel.  See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 195, 103 S. Ct. 1713, 1717–18 (1983).

3

or site safely from service and reduce residual radioactivity to a level that permits

. . . [r]elease of the property . . . and termination of the license.").

Over time, our nation began to see a buildup of spent nuclear fuel.  In

response, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"),

Pub. L. No. 97-425, 96 Stat. 2201 (1983), to provide for permanent disposal of the

spent fuel.  See 42 U.S.C. § 10131(b)(1).  Under the NWPA, the Department of

Energy ("DOE") is responsible for depositing spent nuclear fuel in a permanent

disposal site.  See Nat'l Ass'n of Regulatory Util. Comm'rs v. Dep't of Energy,

680 F.3d 819, 821 (D.C. Cir. 2012).  However, even now, no such storage site

exists in the United States.  Id.

To fund its disposal of spent nuclear fuel, the DOE enters into contracts with

nuclear facilities that obligate the facilities to pay a fee of 1.0 mil[2] per kilowatt-

hour of electricity generated.[3]  42 U.S.C. § 10222(a)(1)–(2); see also 10 C.F.R.

§ 961.11 (codifying standard NWPA contract).  These fees do not go directly to the

DOE, but instead are paid to the Treasury and placed into the Nuclear Waste Fund.

---

[2] A "mil" is 1/10 of a cent.

[3] The NWPA requires the DOE to periodically re-evaluate the fee amount to avoid collecting "either insufficient or excess revenues."  42 U.S.C. § 10222(a)(4).  The DOE has continuously maintained the fee at $1.0 mil per kilowatt-hour and has never suggested any alternatives.  Ala. Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300, 1303–04 (11th Cir. 2002); see also Nat'l Ass'n of Regulatory Util. Comm'rs v. Dep't of Energy, 851 F.2d 1424, 1426 (D.C. Cir. 1988) ("Each year since 1983, the Secretary has published an annual 'Fee Adequacy Report' concluding, not unlike Goldilocks, that the statutory fee is not too high, and not too low, but just right.").

4

42 U.S.C. § 10222(a)(3), (c).  The DOE is then authorized to pay from the Nuclear Waste Fund for the disposal of radioactive waste.  Id. § 10222(d).  "In paying such a fee, the person delivering spent fuel . . . to the Federal Government shall have no further financial obligation to the Federal Government for the long-term storage and permanent disposal of such spent fuel . . . ."  Id. § 10222(a)(3).

NextEra entered into NWPA contracts with the DOE.  It paid approximately $200 million in contract fees to the Nuclear Waste Fund during the years of 2003–05 and 2008–10.

2.      Net Operating Losses and Carryback Provisions

NextEra makes its claims for a tax refund based on the tax code's treatment of net operating losses.  A net operating loss exists whenever a taxpayer has more available deductions in a given year than the taxpayer is allowed to take.  See 26 U.S.C. § 172(c) (2012).  The tax code allows a taxpayer to "carryover" those extra deductions to a future tax year, or to "carryback" the deductions to a previous tax year.  See id. § 172(b)(1)(A).  Ordinarily a carryback is limited to the two tax years preceding the year of the net operating loss.  Id. § 172(b)(1)(A)(i).  But certain types of net operating losses are allowed a longer carryback period.

At all times relevant to this case, Section 172(f) of the tax code provided for one of the extended carryback periods.[4] This section defined a "specified liability loss," which had a carryback period of ten years. See id. § 172(b)(1)(C), (f). Section 172(f) allowed these longer carryback periods for certain liabilities, including "[a]ny amount allowable as a deduction under this chapter . . . which is in satisfaction of a liability under a Federal or State law requiring . . . the decommissioning of a nuclear power plant (or any unit thereof)." Id. § 172(f)(1)(B)(i)(II). This type of liability could be considered a specified liability loss only if "the act (or failure to act) giving rise to such liability occurs at least 3 years before the beginning of the taxable year." Id. § 172(f)(1)(B)(ii)(I).

Yet another provision of the Internal Revenue Code provided an even longer carryback period for "that portion of a specified liability loss which is attributable to amounts incurred in the decommissioning of a nuclear power plant (or any unit thereof)." Id. § 172(f)(3). This type of loss could be carried back to "the taxable year in which such plant (or unit thereof) was placed in service." Id. § 172(f)(3)(A).

Section 172 does not define the term "decommissioning of a nuclear power plant."

---

[4] In 2017, this provision was removed from the tax code. This change in the tax code has no bearing on how we decide this case. See Sorenson v. Sec'y of the Treasury, 475 U.S. 851, 855 & n.4, 106 S. Ct. 1600, 1604 & n.4 (1986) (evaluating refund claim under tax code in effect at time the tax was paid).

C.    PROCEDURAL BACKGROUND

In June 2012, NextEra's tax filings sought a refund of approximately $97 million from their tax payments made between 1969 and 1995.  NextEra sought this refund based on net operating losses from NWPA fees paid during 2003–05 and 2008–10.  By April 2015, when the IRS had still made no decision on the validity of its refund claims, NextEra brought this action in federal court.  Each count of NextEra's complaint makes the same argument: that fees paid under an NWPA contract qualify as specified liability losses under Section 172(f).

NextEra and the United States filed cross-motions for summary judgment. The parties agreed to present only the legal issues regarding the carryback provisions for NWPA contract fees—in other words, whether NextEra was entitled to any amount of refund.  The computation of the refund amount would be decided only if NextEra prevailed at the initial summary-judgment stage.

The District Court granted summary judgment to the United States.  It began by evaluating the varying definitions of "decommissioning" offered by the parties. In the process, the District Court found that spent nuclear fuel was neither "commissioned" nor "decommissioned" under the plain meaning of those terms. Next, the District Court considered regulations invoked by the parties, and found they either did not apply or did not support NextEra's claims.  Ultimately, the

District Court found the NWPA contract fees paid by NextEra do not qualify as specified liability losses under Section 172(f).

The District Court then considered the government's alternative argument: that even if disposal of spent nuclear fuel qualified as "decommissioning," NextEra is still not entitled to a refund because federal law requires the DOE, not NextEra, to actually dispose of the spent nuclear fuel. The District Court agreed with this argument as well. It found that the DOE was the body with the actual "liability under a Federal . . . law" to dispose of the radioactive material. The District Court observed that the NWPA contract fees do not go directly to the task of disposing of radioactive material. Those fees instead go to the Nuclear Waste Fund, which the DOE draws from to support its obligation to permanently dispose of civilian radioactive waste nationwide.

NextEra filed this appeal.

## II.  STANDARD OF REVIEW

This Court reviews <u>de novo</u> the District Court's grant of summary judgment, viewing the facts and drawing all reasonable inferences in the light most favorable to the non-moving party. <u>Rioux v. City of Atlanta</u>, 520 F.3d 1269, 1274 (11th Cir. 2008). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552 (1986). The

8

District Court's interpretation of the tax code is reviewed de novo.  Batchelor-Robjohns v. United States, 788 F.3d 1280, 1284 (11th Cir. 2015).

### III.  DISCUSSION

There are no facts in dispute in this appeal.  It presents only the legal question of whether the NWPA contract fees paid by NextEra qualify as specified liability losses under Section 172(f).  There are two components to this question: (1) whether the disposal of spent nuclear fuel qualifies as "decommissioning of a nuclear power plant (or any unit thereof)"; and (2) whether NextEra's fees paid to the Nuclear Waste Fund are incurred as a "liability under a Federal or State law requiring [nuclear decommissioning]."  NextEra must prevail on both components to be entitled to a refund.  See INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84, 112 S. Ct. 1039, 1043 (1992) ("[T]he burden of clearly showing the right to the claimed deduction is on the taxpayer." (quotation omitted)).

A.    DEFINITION OF DECOMMISSIONING

Under Section 172(f), the extended carryback period applies only when costs were incurred under a law requiring the "decommissioning of a nuclear power plant (or any unit thereof)."  NextEra argues that disposing of spent nuclear fuel is "essential to commissioning and decommissioning a nuclear power plant." Primarily, NextEra argues that because its plants cannot be fully decommissioned

9

until all radioactive material is removed, the term "decommissioning" must encompass the removal of spent nuclear fuel.

This argument is flawed. Spent nuclear fuel must be periodically disposed of, just as trash must be removed from a home. But the regular removal of household trash does not mean the occupants of the home are closing it down. In the same way, the ordinary disposal of spent nuclear fuel is an operational necessity for running a nuclear power plant. It is not an indication that the facility is being "remove[d] . . . safely from service." See 10 C.F.R. § 50.2. Although the removal of radioactive material is a necessary step for decommissioning, every removal of spent nuclear fuel during the life of the facility is not itself an act of decommissioning. After all, if a nuclear plant operated in perpetuity—and never decommissioned—spent nuclear fuel would still need to be removed because the fuel "will remain dangerous for time spans seemingly beyond human comprehension." New York, 681 F.3d at 474 (quotation omitted).

NextEra points to various federal regulations to support its argument that "[d]ecommissioning a nuclear power plant is about ridding the site of radioactive waste and spent nuclear fuel so the license can be terminated." The government answers with its own regulations, and in particular the parties have argued whether 26 C.F.R. § 1.468A-1 is instructive in answering this question. This regulation defines "nuclear decommissioning costs" to include "expenses to be incurred in

10

connection with the entombment, decontamination, dismantlement, removal and disposal of the structures, systems and components of a nuclear power plant, whether that nuclear power plant will continue to produce electric energy or has permanently ceased to produce electric energy." 26 C.F.R. § 1.468A-1(b)(6). However, that regulation expressly excludes "expenses to be incurred in connection with the disposal of spent nuclear fuel under the [NWPA]." Id. NextEra argues that the exclusionary language is insignificant because the NRC had already promulgated other regulations dealing with that issue and didn't need to duplicate funding regulations.

Parsing these definitions is unnecessary. Even if we accept these regulatory definitions as relevant, NextEra would have succeeded only in showing again that removing spent nuclear fuel is a necessary part of decommissioning. NextEra has yet to demonstrate that removing spent nuclear fuel is itself an act of removing a part of a nuclear power plant from service, i.e., "decommissioning." In our view, disposing of spent nuclear fuel is best thought of as a periodic operational expense and does not qualify as "decommissioning" all or part of a nuclear power plant.

NextEra also argues that the cost of permanent disposal of spent nuclear fuel should be treated the same as costs incurred to temporarily store spent nuclear fuel pending delivery of that fuel to the DOE for permanent disposal. Such temporary storage costs are considered "nuclear decommissioning costs" under 26 C.F.R.

11

§ 1.468A-1(b)(6).  However, permanent storage costs have typically been treated differently than temporary storage costs.  Permanent storage costs are funded on a collective basis through the payment of NWPA contract fees, and the amount of those fees is based on the amount of electricity produced each quarter.  See 42 U.S.C. § 10222(a)(1)–(2); see also 10 C.F.R. § 961.11.  In that sense, NWPA contract fees are akin to a tax on nuclear energy production for the purpose of funding the DOE's total cost of permanently storing all civilian spent nuclear fuel.  In contrast, temporary storage costs are borne on an individual basis by each power plant and are incurred not when energy is produced, but when spent fuel is removed from the reactor and stored in preparation for eventual removal from the plant.  If the plant were decommissioned, it would still bear the costs of temporary on-site storage, even though it would no longer incur any costs for permanent storage.  Given these differences, we are not convinced that permanent storage costs must be treated the same as temporary storage costs under Section 172(f).

B.    OBLIGATIONS UNDER FEDERAL LAW

Even if we assume NextEra could prevail on the first prong of its argument, it would not qualify for a refund because Section 172(f) requires that losses be incurred "in satisfaction of a liability under a Federal or State law requiring [nuclear decommissioning]."  Our review has disclosed no law requiring NextEra or any nuclear facility to engage in decommissioning.

NextEra argues it bears the burden of decommissioning because, as a matter of law, decommissioning cannot take place until all spent nuclear fuel is removed. Perhaps, but no law requires NextEra to ever decommission its plants. Granted, every nuclear plant operator must provide the NRC with a decommissioning plan and must maintain funds sufficient for decommissioning. See 10 C.F.R. § 50.75(a). But currently, nuclear plants may lawfully remain operational in perpetuity, and any operational plant needs to dispose of spent nuclear fuel on an ongoing basis. Therefore NextEra's NWPA contract fee payments are not made pursuant to a "law requiring . . . the decommissioning of a nuclear power plant." 26 U.S.C. § 172(f)(1)(B)(i)(II) (2012) (emphasis added).

NextEra also argues it is ultimately responsible for the decommissioning of a plant because it pays the costs of permanent disposal of spent nuclear fuel. In support, NextEra relies on this circuit's only case that addressed the NWPA in any detail: Alabama Power Co. v. U.S. Department of Energy, 307 F.3d 1300 (11th Cir. 2002). In Alabama Power, this Court ruled on an amendment to the standard NWPA contract, which allowed the DOE to settle outstanding claims with nuclear facilities by offsetting their fee amounts. Id. at 1306. The Court held that the amendment exceeded the DOE's statutory authority.[5] Id. at 1312–13, 1316.

---

[5] The Court also struck down the "legislative veto" provision of the NWPA, 42 U.S.C. § 10222(a)(4), after similar regulatory provisions were found unconstitutional in INS v. Chadha, 462 U.S. 919, 103 S. Ct. 2764 (1983). Ala. Power, 307 F.3d at 1307–08, 1316.

13

While the core holding of Alabama Power is not at issue here, the opinion included a general discussion of the regulatory scheme of the NWPA. In two instances, the Alabama Power opinion described the NWPA's apportionment of responsibility for disposing of nuclear waste. It said: "[Under the NWPA,] the U.S. Government would take responsibility for disposing of the waste, and the utilities that produced the waste would bear the cost. The NWPA thus established a quid pro quo; the Government would provide a valuable service and utilities would pay money for this service." Id. at 1302. The opinion also described how "[t]he NWPA provides that the entities owning and operating nuclear power plants, as generators and owners of nuclear waste, will pay the full cost of disposing of the waste." Id. at 1303.

NextEra relies on this language to argue that it fully pays for the permanent disposal of the spent nuclear fuel, meaning it is responsible for the decommissioning. But funding is only part of the responsibility of decommissioning. Alabama Power recognized that the "responsibility for disposing of the waste" belongs to the DOE. Id. at 1302. As the District Court noted, the DOE's obligation to dispose of nuclear waste and the plant's obligation to pay funds to the Nuclear Waste Fund are "two separate legal obligations." Despite NextEra's arguments to the contrary, Alabama Power offers only a general overview of the NWPA. The things the opinion said about the Nuclear Waste

14

Fund were not necessary to decide the case before it.  Thus, our ruling here that fees paid to the Nuclear Waste Fund do not place the burden of disposing of spent nuclear fuel on the power plants—even if those fees constitute the "full cost of disposing of the waste," id. at 1303—is not in conflict with Alabama Power.

The District Court also correctly held that NWPA fees are tied to the production of electricity and not to the direct cost of nuclear waste disposal. NextEra argued the "act" giving rise to the liability for decommissioning was either the initial start-up of the nuclear power plant or the "insertion and irradiation of the nuclear fuel assemblies in the reactor core."  However, the NWPA contracts determine the fee based on the amount of electricity generated in the preceding quarter.  See 42 U.S.C. § 10222(a)(1)–(2); see also 10 C.F.R. § 961.11.  If NextEra had constructed nuclear power plants, but never produced electricity, then it would have incurred no NWPA contract fees.  The NWPA contract fees were therefore incurred for the production of electricity, as opposed to any law requiring decommissioning.  And because the acts giving rise to the liability happened in the quarters immediately preceding the months in which the fees were paid, those acts did not occur more than three years prior to the claimed loss.  See 26 U.S.C. § 172(f)(1)(B)(ii)(I) (2012).

For these reasons, NextEra's NWPA fee payments were not made pursuant to a law that requires nuclear decommissioning.

15

## IV.  CONCLUSION

Under Section 172(f), NextEra would be entitled to a refund only if it could show that its payment of NWPA fees was for an act that qualified as nuclear decommissioning, was done pursuant to a law that required nuclear decommissioning, and that the act occurred more than three years prior to the claimed loss.  It has shown none of these.  Therefore, the judgment of the District Court is

**AFFIRMED.**