[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 3, 2011
JOHN LEY
CLERK

No. 10-10886

D. C. Docket No. 4:08-cv-00324-RH-WCS

FLORIDA WILDLIFE FEDERATION, INC.,
SIERRA CLUB, INC.,
ENVIRONMENTAL CONFEDERATION OF SOUTHWEST FLORIDA, INC.,
ST. JOHNS RIVERKEEPER, INC.,
CONSERVANCY OF SOUTHWEST FLORIDA, INC.,

Plaintiffs-Appellees,

FWEA UTILITY COUNCIL,
FLORIDA MINERALS AND CHEMISTRY COUNCIL, INC.,
STATE OF FLORIDA DEPARTMENT OF AGRICULTURE,

Intervenors-Plaintiffs-
Appellees,

FLORIDA FARM BUREAU FEDERATION,

Intervenor-Plaintiff-Cross
Claimant-Appellee,

versus

SOUTH FLORIDA WATER MANAGEMENT DISTRICT,

Intervenor-Appellant,

LISA P. JACKSON,
Administrator of United States Environmental Protection Agency,

                                        Defendant-Appellee,

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                                        Defendant-Cross Defendant-
                                        Appellee.

_____

No. 10-11121
_____

D.C. Docket No. 4:08-cv-00324-RH-WCS

FLORIDA WILDLIFE FEDERATION, INC.,
SIERRA CLUB, INC.,
ENVIRONMENTAL CONFEDERATION OF SOUTHWEST FLORIDA, INC.,
ST. JOHNS RIVERKEEPER, INC.,
CONSERVANCY OF SOUTHWEST FLORIDA, INC.,

                                        Plaintiffs-Appellees,

FWEA UTILITY COUNCIL,

                                        Intervenor-Plaintiff-Appellant,

SOUTH FLORIDA WATER MANAGEMENT DISTRICT,

                                        Intervenor-Plaintiff-Appellee,

                        versus

LISA P. JACKSON, Administrator of United States Environmental
Protection Agency,

2

                                                 Defendant-Appellee

FLORIDA FARM BUREAU FEDERATION,

                                                 Intervenor-Cross-Claimant-
                                                 Appellee,

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                                                 Defendant-Cross-Defendant-
                                                 Appellee.

                         ————————

                 Appeals from the United States District Court
                      for the Northern District of Florida

                         ————————

                            (August 3, 2011)

Before DUBINA, Chief Judge, EDMONDSON and WILSON, Circuit Judges.

DUBINA, Chief Judge:

        Intervenors-Appellants Florida Water Environment Association Utility

Council and South Florida Water Management District ("Appellants") appeal the

district court's order approving a consent decree between the United States

Environmental Protection Agency (EPA)[1] and a group of environmentalist

organizations ("Plaintiffs"). The consent decree settled a suit filed by the Plaintiffs

--------

[1] As used in this opinion, "EPA" refers collectively to the agency and its administrator, Lisa P. Jackson.

against the EPA that alleged that the agency failed to promulgate timely new water-quality standards for the State of Florida. The Appellants claim that the consent decree is substantively and procedurally unreasonable and that the district court abused its discretion by approving the decree. Because the Appellants have not demonstrated a live case or controversy that would give this court jurisdiction over their case, we dismiss their appeal.

## I.

This case involves the Clean Water Act of 1972, codified at 33 U.S.C. § 1251 *et seq.* Congress passed the Clean Water Act in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2010). Under the Act, the states have the "primary responsibilities and rights . . . to prevent, reduce, and eliminate pollution" in their waters. *See id.* § 1251(b). States can adopt their own water-quality standards, subject to the EPA's approval. If the EPA determines that a state standard is not "consistent with" the Act's requirements, or that "a revised or new standard is necessary" to meet the Act's requirements, the EPA's Administrator must "promptly prepare and publish proposed regulations setting forth a revised or new" standard. *Id.* § 1313(c)(4). The EPA must adopt the revised or new standard within 90 days after publication, unless by that time the state has adopted a revised

or new standard approved by the EPA. *Id.* The Clean Water Act includes a citizen-suit provision, which allows a citizen to sue the Administrator to compel her to perform a duty that the Act makes nondiscretionary, such as proposing new water-quality standards after determining that they are necessary under § 1313(c)(4). *See id.*§ 1365(a)(2).

In 1998, the EPA and the Secretary of the United States Department of Agriculture issued a report stating that about 40 percent of the waters tested by the various states did not meet water-quality goals. [*See* U.S. Dep't of Envt'l. Prot. & U.S. Dep't of Agric., *Clean Water Action Plan: Restoring and Protecting America's Waters*, R. 57-27 at 3.] The EPA's Administrator and the Secretary of Agriculture adopted a Clean Water Action Plan in response. [*Id.* at 6–7.] As part of the effort to implement the Clean Water Action Plan, the EPA issued a second report entitled "National Strategy for the Development of Regional Nutrient Criteria." [*See* R. 33-1.] The report recognized that excessive levels of nutrients such as nitrogen and phosphorous were a substantial part of the nation's water-quality problem. Many states, including Florida, had non-numeric or "narrative" standards governing the introduction of nitrogen and phosphorous into bodies of water. [*See id.* at 9, 39–42.] The National Strategy Report indicated that the EPA

expected all states "to adopt and implement numerical nutrient criteria" to replace narrative standards by December 31, 2003. [*Id.* at 11–12.]

Coinciding with the EPA's push to improve water-quality standards across the country, several environmentalist groups—including some of the Plaintiffs in this case—sued the EPA under the Clean Water Act to force it to issue new site-specific standards regulating nutrient quality for certain bodies of water in Florida. To settle the lawsuit, the EPA and the environmentalist groups entered into a consent decree in 1999 ("1999 Consent Decree") that required the EPA to set numeric water-quality standards for those specified sites, if Florida did not do so first. [R. 36-1.]

By 2001, Florida's Department of Environmental Protection had begun developing numeric nutrient standards. The Department, in conjunction with the state's Water Management Districts, conducted detailed studies, held meetings, and promulgated 79 specific total maximum daily loads ("TDMLs") for various nutrients in specific bodies of water. Fla. Admin. Code Ann. r. 62-304.300 to 810 (adopted 2005–2010). But the state did not adopt or even propose state-wide numeric standards. Instead, the state retained its narrative standard: the concentration of nutrients in a body of surface water must not be altered "so as to

cause an imbalance in natural populations of aquatic flora or fauna." Fla. Admin. Code Ann. r. 62-302.530(47)(b) (revised 2010).

Five environmentalist groups filed this lawsuit in July 2008, naming the EPA and its Administrator as the defendants.[2] The Plaintiffs claimed that either the 1998 Clean Water Action Plan or the 1998 National Strategy Report constituted a "determination" that Florida's narrative nutrient standard was inadequate, thus imposing on the Administrator the nondiscretionary duty to "promptly" publish proposed new standards and adopt them within 90 days of publication. Over time, 13 entities intervened as defendants.[3] The EPA and intervenors denied that the 1998 documents constituted a determination under 33 U.S.C. 1313(c)(4).

While the suit was still pending, the Administrator made an explicit and unequivocal determination by a letter dated January 14, 2009 ("2009 Determination") that the Florida narrative nutrient standard was inadequate and that a revised or new standard was necessary to meet the Clean Water Act's

---

[2] The Plaintiffs are the Florida Wildlife Federation, Inc.; Sierra Club, Inc.; Conservancy of Southwest Florida, Inc.; Environmental Confederation of Southwest Florida, Inc.; and St. Johns Riverkeeper, Inc.

[3] The intervenors in the district court were Florida Pulp and Paper Association Environmental Affairs, Inc.; the Florida Farm Bureau Federation; Southeast Milk, Inc.; Florida Citrus Mutual, Inc.; Florida Fruit and Vegetable Association; American Farm Bureau Federation; Florida Stormwater Association; Florida Cattleman's Association; Florida Engineering Society; the South Florida Water Management District; the Florida Water Environment Association Utility Council, Inc.; the Florida Minerals and Chemistry Council, Inc.; and the Florida Department of Agriculture and Consumer Services.

7

requirements. [*See* R. 55-6.] The EPA's formal determination that Florida's water-quality standards were inadequate triggered the agency's statutory obligation to "promptly prepare and publish proposed regulations setting forth a revised or new water quality standard." 33 U.S.C. § 1313(c)(4).

On August 25, 2009, the Plaintiffs and the EPA moved for entry of a consent decree. [R. 90.] The proposed consent decree would require the EPA to implement two separate phases of rulemaking. In Phase I, the agency would propose numeric nutrient standards for Florida's lakes and flowing waters by January 14, 2010, and adopt those standards by October 15, 2010. These requirements would not apply, however, if by the same deadlines the state proposed its own numeric standards and the EPA's Administrator approved them. In Phase II, the EPA would have to publish numeric nutrient standards for Florida's coastal and estuarine waters by January 14, 2011, and adopt standards by October 15, 2011. The proposed decree would allow an extension of a deadline by agreement between the Plaintiffs and the EPA upon notice to the district court. The decree also gave the district court the discretion to grant time extensions even without the Plaintiffs' consent.

All parties—including the intervenors—were allowed to file briefs, declarations, and other written evidence addressing the motion for entry of the

consent decree. The parties presented extensive oral argument. After considering the arguments, the district court issued an order on December 30, 2009, approving the consent decree ("2009 Consent Decree") over the intervenors' objections. [R. 152.] Of the thirteen original intervenors, only two—the Water Management District and the Utility Council—appealed the district court's order.

Since the district court approved the consent decree, the EPA has followed the timeframe for promulgating new numeric water-quality standards for the State of Florida. The agency published the Phase I proposed numeric criteria for Florida's lakes and flowing waters on January 26, 2010. Water Quality Standards for the State of Florida's Lakes and Flowing Waters, 75 Fed. Reg. 4,174 (proposed Jan. 26, 2010) (to be codified at 40 C.F.R. pt. 131). The EPA offered a 90-day public comment period for the proposed rule, during which it received 22,000 public comments and conducted thirteen public hearings in six cities in Florida. [R. 188-1 at 2.] The Utility Council submitted a lengthy comment to the EPA, arguing against the adoption of the proposed rule and citing evidence that showed that Florida's existing standards were sufficient to meet the Clean Water Act's goal "to prevent, reduce, and eliminate [water] pollution." [R. 190-3 at 11 (quoting 33 U.S.C. § 1251(b)).] On October 8, 2010, the EPA filed a motion to extend the deadline for Phase I of the new criteria until November 14, 2010, so it could

finalize its review of the comments; the district court granted the motion a few weeks later. [R. 192.] The EPA issued the new criteria for Florida's lakes and streams on November 14, 2010, and the criteria appeared in the Federal Register on December 6, 2010. Water Quality Standards for the State of Florida's Lakes and Flowing Waters, 75 Fed. Reg. 75,762 (Dec. 6, 2010) (to be codified at 40 C.F.R. pt. 131) ("December 2010 Rule").

Work on Phase II of the new numeric water quality criteria for coastal and estuarine waters remains ongoing. On June 7, 2010, the EPA and the Plaintiffs agreed to extend the deadline for publishing a proposed rule for Phase II of the new numeric water quality criteria until November 14, 2011, with a new deadline for the final rule of August 15, 2012. [R. 184 at 3.]

**II.**

On appeal, the Water Management District and the Utility Council claim that the consent decree is procedurally and substantively unreasonable and that the district court's approval of the decree constituted an abuse of discretion. The EPA argues that the Appellants lack standing to pursue their case because they have not presented a constitutional case or controversy. We agree with the EPA, and we dismiss the Appellants' appeal for lack of subject matter jurisdiction.

10

Article III of the Constitution limits the federal courts to deciding "cases" and "controversies." U.S. Const. art. III, § 1. The Supreme Court has long recognized that this limitation means that the federal courts cannot exercise jurisdiction over cases where the parties lack standing, or where the issue in controversy has become moot. *See Summers v. Earth Island Inst.*, 555 U.S. 488, ___, 129 S. Ct. 1142, 1148–49 (2009).

A federal court has the obligation to review *sua sponte* whether it has subject matter jurisdiction under Article III's case-or-controversy requirement. *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003) (citing *Juidice v. Vail*, 430 U.S. 327, 331, 97 S. Ct. 1211, 1215 (1977)). In order to establish that it has constitutional standing to bring a suit:

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180–181, 120 S. Ct. 693, 704 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S. Ct. 2130, 2136 (1992)).[4] If at any point in the litigation

---

[4] If the plaintiff is an organization, then under the doctrine of associational standing only one of its members needs to satisfy the case-or-controversy requirement in order for the organization to

the plaintiff ceases to meet all three requirements for constitutional standing, the case no longer presents a live case or controversy, and the federal court must dismiss the case for lack of subject matter jurisdiction. *See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1277 (11th Cir. 2006); *De La Teja v. United States*, 321 F.3d 1357, 1362 (11th Cir. 2003).

When third-party intervenors appeal a consent decree that both the nominal plaintiffs and defendants support, the court's standing analysis becomes more complicated. While the case is pending in the district court, there is a live case or controversy between the plaintiff and defendant, so the intervenors are free to challenge the proposed consent decree without having to prove standing independently. Once the district court approves the consent decree, however, the original case or controversy evaporates, and an intervenor appealing the decree must assert an independent case or controversy in order to maintain standing. *Diamond v. Charles*, 476 U.S. 54, 68, 106 S. Ct. 1697, 1706 (1986) ("[A]n intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he

have standing to litigate the claim, so long as the interests at stake are germane to the organization's purpose and neither the claim nor the relief involved require the individual members' participation. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977).

12

fulfills the requirements of Art. III."). "The mere existence of a permanent injunction or consent decree thus is insufficient to provide an ongoing case or controversy upon which an intervenor may ride 'piggyback' . . . ." *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1337 (11th Cir. 2007) (internal quotation marks omitted).

The Utility Council alleges that the district court's order approving the consent decree caused three distinct injuries. First, it claims it will be injured by the conflicting compliance directives in the 1999 Consent Decree and the 2009 Consent Decree. Second, the Utility Council claims it will be injured by having only limited input into the EPA's rulemaking procedures due to the timeframes the 2009 Consent Decree imposes. Third, the Utility Council claims a procedural injury stemming from the district court's denial of its request for an evidentiary hearing before the district court approved the consent decree.

The Water Management District alleges two injuries of its own. First, it claims violations of its due process and administrative rights resulting from the Plaintiffs and EPA's entering into a consent decree without an administrative record, without allowing adequate discovery, and without demonstrating adequate fairness. Second, it claims it is injured by the consent decree's "unrealistic" timeframe for the adoption of new numeric water quality criteria.

13

We break down our analysis of the justiciability issues in this case into two parts. First, we analyze the Appellants' claims challenging Phase I of the consent decree's rulemaking directives, which set a timeframe for the promulgation of a final rule regulating Florida's lakes and flowing waters. Phase I was completed in 2010 and resulted in the promulgation of the December 2010 Rule. Second, we consider the Appellants' claims challenging the consent decree's timeframes for the promulgation of the Phase II final rule, which will regulate Florida's coastal and estuarine waters. The EPA has not yet proposed or promulgated a Phase II rule; the parties have agreed to extend the consent decree's deadline for proposing the Phase II rule until November 14, 2011. We conclude that neither category of claims presents a justiciable issue.[5]

---

[5] Even if we were to reach the merits of the Appellants' arguments, their appeal would fail. The 2009 Consent Decree does not unreasonably conflict with the 1999 Consent Decree, it does not restrict the Appellants' ability to participate in the notice-and-comment rulemaking process for the new numeric-criteria rules, it does not unlawfully curtail the timeframe for rulemaking procedures, and the district court did not abuse its discretion by declining to hold evidentiary hearings after reviewing extensive briefing and conducting oral argument.

**A. The Appellants' claims challenging Phase I of the rulemaking process are moot because they cannot be redressed by this court.**

The Appellants present two types of claims stemming from the promulgation of the December 2010 Rule. First, they claim that the 2009 Consent Decree led to the promulgation of a substantively unfair rule that presents them with obligations that conflict with their duties under the terms of the 1999 Consent Decree. Second, they claim that the timeframe set for the promulgation of the December 2010 Rule by consent decree was unreasonable. Because we cannot redress either of these alleged injuries stemming from the promulgation of the December 2010 Rule, we dismiss these claims as moot.

In order for the Appellants to show that they have standing on appeal, they must demonstrate that their alleged injury "will be redressed by a favorable decision." *Ala. Power Co. v. U.S. Dept. of Energy*, 307 F.3d 1300, 1308–1309 (11th Cir. 2002) (citing *Lujan*, 504 U.S. at 560–61, 112 S. Ct. at 2136). "Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) (internal quotation marks and alterations omitted). If, due to events that have happened since the filing of the complaint, the

15

court can no longer redress the injuries claimed by the parties, the case is moot and should be dismissed. *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dept. of Health & Rehab. Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000); *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009) ("To decide a moot issue is to issue an advisory opinion, one unnecessary to the judicial business at hand and outside the authority of Article III courts.").

The only way that this court could issue a decision that "directly redresses the injury suffered" from the December 2010 Rule is if we were able to strike down the rule itself. In other words, the rule would have to depend on the validity of the consent decree. Because this is not the case, the Appellants' alleged injuries stemming from the December 2010 Rule are not redressable and do not present a justiciable claim under the mootness doctrine.

No party contests that a valid 33 U.S.C. § 1313(c)(4) determination by the EPA would invoke the agency's mandatory duty to "promptly prepare and publish proposed regulations setting forth a revised or new water quality standard." Neither the Water Management District nor the Utility Council claims that the validity of the 2009 Determination is an issue before the court on appeal. *See* Water Mgmt. Dist. Reply Brief at 16; Utility Council Supp'l Brief at 3 (noting that the Utility Council has filed a complaint challenging the 2009 Determination in a

separate case, *Fla. Water Envtl. Ass'n Util. Council v. Jackson*, Case No. 4:09-CV-428-RHWCS (N.D. Fla. Nov. 4, 2009)). Without any reason to question the validity of the 2009 Determination, the EPA's statutory duty to promulgate numeric water-quality standards for Florida stands as well. Striking down the consent decree would not affect the validity of the December 2010 Rule and thus the Appellants' alleged injuries stemming from it are not redressable.

In addition, the Appellants claim that they suffered injuries caused by the procedures and timeframes used in the Phase I rulemaking process.[6] These claims are also moot. Once the EPA promulgates the rule, any injuries sustained in the rulemaking process can no longer be redressed. The bell cannot be un-rung. *See Robinson v. Comm'rs Court, Anderson Cnty.*, 505 F.2d 674, 682 (5th Cir. 1974) (holding that a challenge to order postponing election filing deadlines was moot after the filing deadlines passed).[7]

---

[6] It seems highly unlikely that the alleged procedural injuries the Appellants suffered by being excluded from the rulemaking process satisfy the "imminent, concrete" injury requirement for standing. *See Lujan*, 504 U.S. at 573–74, 112 S. Ct. at 2143. Nonetheless, we assume that the "concrete injury" element is satisfied and instead address the question of mootness. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67, 117 S. Ct. 1055, 1068 (1997) (noting that the court may assume without deciding that standing exists in order to analyze mootness).

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Recognizing its dilemma, the Water Management District ventures one last argument to preserve its claims of injuries stemming from the December 2010 Rule. It argues that the issue is justiciable because it falls into the category of claims "capable of repetition, yet evading review." Water Mgmt. Dist. Supp'l Brief at 3 (invoking language from *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S. Ct. 1181, 1183 (1982)). This is incorrect. A direct challenge to either the 2009 Determination or the December 2010 Rule would encompass judicial review of all of the issues associated with the Appellants' claims in this case, such as the administrative record, the EPA's decisionmaking process, the EPA's adherence to the relevant statutory and regulatory procedures, and the scope of practical consequences for the Appellants. This is most certainly not an issue "evading review" by the federal courts.

The Appellants have failed to show how their claims related to Phase I of the EPA's rulemaking process under the 2009 Consent Decree present a justiciable issue for this court. We therefore dismiss them.

**B. The Appellants' claims related to the EPA's forthcoming Phase II rule are not justiciable because the alleged injuries cannot be traced to the district court's order approving the consent decree and a decision by this court would not redress those injuries.**

Second, the Appellants allege injuries stemming from Phase II of the EPA's rulemaking process under the consent decree, which will set numeric water-quality standards for Florida's coastal and estuarine waters under a final rule which must be promulgated by August 14, 2012. The Appellants claim that the consent decree instituted an abbreviated and unreasonable timetable for the rulemaking process and that the results of that flawed process will cause them great damages in compliance costs. Because these alleged harms can be traced to the EPA's 2009 Determination, not the consent decree itself, and any judgment by this court reversing the approval of the consent decree would not redress the Appellants' alleged grievances, we conclude that the Appellants lack standing to bring this appeal. We accordingly dismiss the appeal in its entirety.

In order for the Appellants to have standing for their claims related to Phase II of the EPA's rulemaking pursuant to the consent decree, they must demonstrate that the harmful aspects of the rule or process are "traceable to the alleged wrongful acts." *Ala. Power Co.*, 307 F.3d at 1308. They cannot meet this requirement. In the EPA's 2009 Determination, the agency explicitly noted that

Florida's *narrative* water-quality standards were inadequate; instead, the EPA determined that "numeric nutrient criteria are needed to protect Florida's designated uses." [R. 55-6 at 8.] This determination invoked a non-discretionary duty for the EPA to "promptly" promulgate new water-quality standards for the state. In accordance with the EPA's explicit determination, the agency's new water-quality standards are numeric instead of narrative. As noted above, the validity of the 2009 Determination is not an issue before the court. The Appellants are instead challenging a consent decree which did not impose any new duty or condition upon the EPA's existing obligations to promptly promulgate numeric water criteria for Florida's waters. Thus the Appellants' alleged substantive injuries stemming from the anticipated final rule are not traceable from the consent decree, but from the 2009 Determination.

The Appellants have also failed to satisfy the third prong of standing: redressability. *Friends of the Earth, Inc.*, 528 U.S. 167 at 181, 120 S. Ct. at 704. "The element of redressability requires that 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1266 (11th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136). The EPA's power and duty to promulgate water quality standards for Florida come from its

determination pursuant to 33 U.S.C. § 1313(c)(4) that Florida's existing standards were inadequate—not from a consent decree. Even if this court reversed the district court's decision approving the 2009 Consent Decree, the unchallenged 2009 Determination and the water-quality standards promulgated under it would stand. The Appellants would thus still be subjected to the same numeric criteria that they face under the current circumstances. Because a favorable decision would not redress the Appellants' alleged concrete injuries, we lack jurisdiction to consider their appeal. *See DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1303 (11th Cir. 2008) (dismissing complaint for lack of standing because it did not "suggest in any way how [the] 'injury' could be redressed by a favorable judgment").

The Appellants' only remaining argument is that the consent decree set forth an abbreviated timeframe for the promulgation of new rules that denies them procedural rights to suggest comments and be heard in the process. This claim lacks both an imminent, concrete injury and traceability. If the Appellants are harmed by being given inadequate opportunities to influence the rulemaking process, the harm comes in the promulgation of the final rule itself, not in the consent decree's setting of a timeframe. *See Summers*, 555 U.S. at ___, 129 S. Ct. at 1151 ("[D]eprivation of a procedural right without some concrete interest that is

affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). Moreover, the EPA retained full discretion to set an identical timeframe for its own mandatory rulemaking procedures after the 2009 Determination, regardless of the terms of the consent decree. As the EPA has never suggested that it would have used a longer timeframe without the consent decree, there is no basis for finding that the Appellants' alleged injuries can be traced to the 2009 Consent Decree instead of the 2009 Determination.

The dissent suggests that our decision severely restricts the rights of parties seeking to challenge drastic agency actions before a final rule is in place. Not so. The Intervenors had an open door to bring a full challenge to the agency's 2009 Determination that Florida's existing *narrative* water quality standards were inadequate—the real source of their alleged injuries. *See Miss. Comm'n on Natural Res. v. Costle*, 625 F.2d 1269, 1275–77 (5th Cir. 1980) (discussing a state's challenge to an EPA determination under 33 U.S.C. § 1313(c)(4)). They chose instead to challenge a consent decree which did nothing to change the effect of the 2009 Determination. And while our law does not require a party to rely solely on a single avenue for bringing suit when multiple avenues are available, *Ala. Power Co.*, 307 F.3d at 1309, a challenge to the consent decree does not fit

the bill, as it did not create the alleged substantive injury and our decision to reverse its approval would not redress the Appellants' alleged grievances.

## III.

Standing is a rigid doctrine, and it can lead to an abrupt end to a case that has consumed large amounts of judicial and social resources. Nonetheless, this court is bound by the Constitution, not the dictates of convenience. For the aforementioned reasons, we conclude that the Appellants lack standing to appeal. They seek to challenge a consent decree that establishes a schedule under which the EPA has begun promulgating numeric water-quality criteria for nutrients in Florida's waters. However, the only alleged injuries about which they complain occur—if ever at all—after the promulgation of the EPA's final rules and possibly not until those criteria are actually applied to the Appellants through incorporation into their individual discharge permits. Once the rules have been promulgated and implemented, the Appellants may bring suit raising the arguments they try to raise here. But in this case, their challenges to anticipated effects of the scheduling of the rulemaking process are entirely speculative.

**APPEAL DISMISSED.**

WILSON, Circuit Judge, dissenting.

I dissent from the majority's dismissal of Appellants' claims related to the EPA's forthcoming Phase II rule.  Although Appellants have demonstrated that they have been injured by the consent decree, the majority's opinion effectively eliminates all means by which Appellants could challenge any errors made by the district court when approving it.  Because: (1) nothing in standing doctrine requires Appellants to rely solely on one particular avenue for suit where multiple, justiciable avenues exist, *see Ala. Power Co. v. U.S. Dept. of Energy*, 307 F.3d 1300, 1309 (11th Cir. 2002) (rejecting the Department of Energy's argument that non-parties to a settlement agreement should await a final decision by the Department before suing, rather than challenging the terms of the settlement agreement); (2) "fairly traceable" does not mean absolutely and exclusively traceable, *see Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (holding, based on analogous facts, that "fairly traceable" does not mean that the defendant's actions must be the very last step in the chain of causation); and (3) our law is clear that a court must not enter a consent decree without the consent of all parties whose rights would be affected, *see United States v. City of Hialeah*, 140 F.3d 968, 978–81 (11th Cir. 1998), this Court should have reached the merits of Appellants'

claims alleging substantive and procedural injuries from the entry of the consent decree.

First, the majority finds that Appellants lack standing because their harms are fairly traceable not to the consent decree, but to the EPA's 2009 Determination, which triggered a non-discretionary duty for the EPA to promulgate new numeric water-quality criteria. *See* Majority Op. at 19–20. The majority then suggests that Appellants' proper avenue for suit is to challenge the 2009 Determination directly, because the consent decree "did nothing to change the effect of the 2009 Determination." Majority Op. at 22. This reasoning is flawed. Although Appellants have challenged the 2009 Determination in a separate, pending case, they are now bound by the terms of the consent decree. Indeed, the district judge presiding over the suit challenging the 2009 Determination has stayed all proceedings pending resolution of Appellants' claims surrounding the consent decree. *See Fla. Water Envtl. Ass'n Util. Council v. Jackson*, No. 4:09-CV-428-RHWCS, No. 15 (N.D. Fla. entered Sep. 29, 2010) (staying all proceedings pending this Court's decision and noting that "[t]his order does not change the parties' obligation to comply with the consent decree"). Because Appellants cannot meaningfully challenge the 2009 Determination so

25

long as the consent decree stands, Appellants' injuries are legally traceable from the consent decree.

Appellants have spent significant resources to ensure that their wastewater systems would satisfy the pre-existing standards mandated by the 1999 consent decree. Understandably, Appellants sought to challenge the 2009 consent decree's conflicting requirements. To this end, the Utility Council provided an expert's affidavit with its motion opposing the consent decree stating that "statewide numeric nutrient criteria will conflict with th[e] ongoing scientifically valid process in which the State and local jurisdictional governments have invested heavily." Thus, there is no question that Appellants alleged a concrete and imminent injury in fact. *See Bennett*, 520 U.S. at 168 ("Given petitioners' allegation that the amount of available water will be reduced and that they will be adversely affected thereby, it is easy to presume specific facts under which petitioners will be injured . . . . [Thus, t]he complaint alleges the requisite injury in fact.").

Appellants' alleged substantive injury—the forthcoming EPA rule mandating numeric nutrient limits—is fairly traceable from the requirements imposed by the consent decree. *See id.* at 168–69 (stating that "injury produced by determinative or coercive effect" satisfies the requirements for standing, and

26

explaining that the government's argument "wrongly equate[d] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation"). The law does not preclude Appellants from challenging the consent decree simply because they could alternatively challenge the 2009 Determination or the results of the EPA's future rulemaking. *Cf. Ala. Power Co.*, 307 F.3d at 1309 (explaining that utility companies seeking to establish standing should not have to wait to challenge a final decision of the Department of Energy where the companies would "[i]n either circumstance . . . be forced to pay for the damages . . .."). If the validity of the 2009 Determination depends on resolution of the consent decree, but a challenge to the consent decree is not justiciable because Appellants should instead challenge the 2009 Determination, Appellants have alleged a legally cognizable injury for which there is literally no legal remedy.

The majority further reasons that Appellants cannot prove an imminent, concrete procedural injury for standing purposes because any such injury would only be justiciable following the EPA's promulgation of the final rule. Majority Op. at 21–22. In so stating, the majority assumes incorrectly that the law prohibits Appellants from challenging the consent decree's *influence* on the forthcoming rulemaking. *See Bennett*, 520 U.S. at 169 (finding that petitioners' injury was

traceable to an advisory opinion, because while that opinion "theoretically serves an 'advisory function,' *in reality it has a powerful coercive effect on the agency action*" (citation omitted) (emphasis added)); *Ala. Power Co.*, 307 F.3d at 1309 (finding that the utility companies need not "await a final decision by the Department"); *United States v. S. Fla. Water Mgmt. Dist.*, 922 F.2d 704, 708–10 (11th Cir. 1991) (finding that plaintiffs had "shown a potential impairment of their rights sufficient to establish intervention," because, although other "avenues of relief would remain open" to plaintiffs through subsequent litigation, the district court's order would likely injure plaintiffs *by influencing a subsequent court's decision*).

Finally, the majority concludes that Appellants suffered no redressible injury, because "the unchallenged 2009 Determination and the water-quality standards promulgated under it would stand." Majority Op. at 21. This is incorrect; a favorable decision by this Court would redress Appellants' injuries by allowing both the EPA and the district court in the separate, pending proceeding to fairly evaluate Appellants' evidence about whether new numeric standards are warranted. Because the district court in this case denied Appellants' motion for an evidentiary hearing, Appellants never had such an opportunity. This is troublesome because Appellants have demonstrated that the district court erred

28

with regard to essential facts when approving the consent decree—for instance, the district court stated that Florida had failed to adopt any numeric nutrient requirements.  On the contrary, the state had already promulgated seventy-nine TMDLs, *see* Fla. Admin Code Ann. r. 62-304 (2004), and Appellants had brought this fact to the court's attention both in a motion hearing and in filed memoranda.

Under the majority's view of traceability and redressibility, no one could ever have standing to challenge a consent decree that is entered prior to a final agency rulemaking on the same matter.  *Cf. Ala. Power Co.*, 307 F.3d at 1309 (rejecting a similarly circular argument that the Secretary of the Department of Energy's duty to report to Congress precludes a finding of "injury" because Congress might alter the Department's determinations through legislation).  Our law does not contemplate such a result.  This Court has made clear that those who are directly affected by a judicially approved consent decree should have an opportunity to challenge it.  *See City of Hialeah*, 140 F.3d at 978–81, 984.  Here, the district court's entry of the consent decree caused Appellants a concrete and imminent injury in fact, and that injury could have been redressed by allowing Appellants some means by which they could challenge the factual basis for the consent decree.  The effect of dismissing Appellants' appeal on standing grounds is that Appellants will be subject to the consent decree's influence on the

29

forthcoming rulemaking and will be bound by any errors of the district court in approving it, but will be stripped of meaningful opportunity to challenge the substantive or procedural reasonableness of the consent decree in court.