# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 20, 2012        Decided June 1, 2012

No. 11-1066

NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS,
PETITIONER

v.

UNITED STATES DEPARTMENT OF ENERGY,
RESPONDENT

Consolidated with 11-1068

On Petitions for Review
of Final Actions of the Department of Energy

*Jay E. Silberg* argued the cause for petitioners. With him
on the briefs were *Timothy J.V. Walsh*, *James Bradford Ramsay*,
and *Anne W. Cottingham*. *Michael A. Bauser* entered an
appearance.

*Joseph A. McGlothlin* and *Richard C. Bellak* were on the
brief for *amici curiae* Florida Public Service Commission, et al.
in support of petitioners. *Cynthia B. Miller* entered an
appearance.

*Harold D. Lester Jr.*, Assistant Director, U.S. Department of Justice, argued the cause for respondent.  With him on the brief were *Tony West*, Assistant Attorney General, and *Jeanne E. Davidson*, Director.

Before: SENTELLE, *Chief Judge*, BROWN, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*:  Petitioners, nuclear power plant owners and operators, ask us to review a November 2010 determination by the Secretary of Energy finding that there was no basis for suspending, or otherwise adjusting, annual fees collected from them totaling some $750 million a year.  Those fees are intended to cover the full costs of the government's long-term disposal of civilian nuclear waste.  But the Administration has discontinued development of Yucca Mountain, which was the designated location for the disposal of the waste.  According to petitioners, the Secretary's 2010 determination, made subsequent to that decision, failed to examine (or even mention) the anticipated costs of disposal, or compare them to expected revenues from the fees (and associated interest and investment income).  The Secretary's determination is claimed, thereby, to have violated the 1982 Nuclear Waste Policy Act ("the Act"), which obliges the Secretary to annually "evaluate whether collection of the fee will provide sufficient revenues" to offset program costs.  In the absence of such evaluation, it is argued, the determination was invalid, and because no future program has replaced Yucca Mountain, petitioners contend that the Secretary is obliged to suspend the fees and report his action to Congress.

We conclude that the Secretary has failed to perform a valid evaluation, as he is obliged to do under the Act, but we do not think it appropriate to order the suspension of the fee at this time. Instead, we remand to the Secretary with directions to comply with the statute within six months. The panel will retain jurisdiction over this case so that any further review would be expedited.[1]

I.

The Act made the federal government responsible for permanently disposing of spent nuclear fuel and high-level radioactive waste produced by civilian nuclear power generation and defense activities. It provided that the government would do so through geologic disposal, which involves constructing a repository deep underground within a rock formation where the waste would be placed, permanently stored, and isolated from human contact. The Department of Energy was required to begin disposal by January 31, 1998. Since 1987, when the Act was amended, the Department has been directed to consider the

---

[1]We also remind the parties that our Handbook of Practice and Internal Procedures states that "parties are strongly urged to limit the use of acronyms" and "should avoid using acronyms that are not widely known." Brief-writing, no less than "written English, is full of bad habits which spread by imitation and which can be avoided if one is willing to take the necessary trouble." George Orwell, "Politics and the English Language," 13 Horizon 76 (1946). Here, both parties abandoned any attempt to write in plain English, instead abbreviating every conceivable agency and statute involved, familiar or not, and littering their briefs with references to "SNF," "HLW," "NWF," "NWPA," and "BRC" – shorthand for "spent nuclear fuel," "high-level radioactive waste," the "Nuclear Waste Fund," the "Nuclear Waste Policy Act," and the "Blue Ribbon Commission."

suitability of one site only – Yucca Mountain, Nevada – for the repository.[2]

Congress's best-laid plans have been frustrated. In 1995, the Department announced that it would be unable to meet the 1998 deadline; the earliest conceivable date for disposal was 2010.[3] In early 2009, the Department said that construction at Yucca Mountain would not begin until at least 2011, and that transportation and disposal of waste would not occur until 2020. Only a few months later the new Administration announced, in an abrupt volte face, that Yucca Mountain "was not a workable option." Instead, it established a Blue Ribbon Commission to reconsider "all alternatives" for permanently disposing of nuclear waste. But the Commission's 2011 Draft Report conceded that geologic disposal was really the only viable option. The Commissioners, however, were directed not to consider any particular site – whether Yucca Mountain or elsewhere. They estimated that selection and evaluation of a site would take another 15 to 20 years (the cliché "kick the can down the road" seems inadequate). Nevertheless, the Department has reaffirmed its obligation to permanently (if eventually) dispose of civilian nuclear waste. In the meantime, civilian nuclear plant operators and owners have stored their waste themselves, usually on-site.[4]

---

[2] 42 U.S.C. § 10101(18); *id.* § 10131(a)(4)-(5); *id.* § 10131(b); *id.* § 10132; *id.* § 10172; *id.* § 10222(a)(5).

[3] *See Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996); Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21,793, 21,794 (May 3, 1995).

[4] As a result of lengthy litigation before us and the Federal Circuit, the government has paid them about $1 billion in retrospective damages to cover some of the costs of storage since 1998, on claims of $6.4 billion. Those claims are not at issue here.

The Act also made the generators of nuclear waste responsible for the full costs of the disposal of *civilian* nuclear waste. The owners and operators were to pay an initial fee to cover the costs of disposing of pre-1983 waste, as well as an annual fee of 1.0 mil (one-tenth of a cent) per kilowatt-hour of nuclear-generated electricity to cover ongoing waste generation. These funds are deposited in the government-managed Nuclear Waste Fund, where they earn interest and investment income. According to budget accounting rules, these funds also count against the federal government's budget deficit ("aye, there's the rub"). When this suit was filed in 2010, owners and operators had paid the fees for nearly three decades (about $750 million a year on top of the initial charge). With investment income, the Fund's balance exceeded $24 billion, and by the end of this year, it will exceed $28 billion.

Although the Act mandates that the Fund cover the lifetime costs of the civilian disposal program – estimated to last over a hundred years – any excess funds must be returned to the payors. Congress anticipated that costs would be uncertain and could well change as the program progressed, so the Secretary was obliged to "annually review the amount of the fees to evaluate whether collection of the fee will provide sufficient revenues to offset the costs as defined in subsection (d) herein." Those costs include the identification, development, construction, operation, and maintenance of repositories for the waste, as well as associated facilities; research and development; and administration. "[I]n the event the Secretary determines that either insufficient or excess revenues are being collected, in order to recover the costs incurred by the Federal Government . . . the Secretary shall propose an adjustment to the fee to insure full cost recovery" and submit it to Congress. The Act – which pre-dated *INS v. Chadha*, 462 U.S. 919 (1983) – provides that the proposed adjustment shall become effective unless, within

90 days of submission, either house of Congress adopts a resolution disapproving it.[5]

The Secretary has never proposed an adjustment to the fee. Since at least 1990, the Department's policy has been "to conduct a thorough analysis annually and to recommend a change in the fee when there is a compelling case for the change." Between 1983 and 2008, fee adequacy assessments identified the expected costs of geologic disposal and compared them to projected revenues from the fee (which were based on projections of future nuclear power generation and interest accumulation).[6] Fee adequacy was calculated by creating models that adjusted for different key variables – for instance inflation, interest rates, future nuclear generation, program timing and total life cycle estimates – and forecasting whether the Fund would likely have a positive balance by the end of the program.

Between 1983 and 1987, the governing assumption was that two repositories would be used, but the Department had to account for a number of uncertainties that dramatically affected costs and revenues. It was unsure what type of rock – salt, tuff, basalt, or crystalline rock – would host the waste, or where the repositories would be located, and projected operational time frames varied widely. Fee adequacy reports dealt with these

[5]42 U.S.C.. § 10222(a)(4).

[6]The Department did not consistently publish its fee adequacy reviews, and in some years – for instance when the reference cost estimate and other assumptions remained the same – apparently no new fee adequacy assessment was completed. The Department also completed a separate series of assessments, called "total system life cost" estimates, to periodically reassess program costs in light of recent developments. Fee adequacy assessments then used these cost estimates and compared them to expected revenues.

uncertainties by using a range of bounding cases; while there was tremendous variability among the different models, the Department nonetheless generated rough estimates of the expected margins of revenues over costs. The Secretary concluded that no fee adjustment was warranted during this period because under most, though not all, scenarios, the Fund showed only a modest positive balance at the end of the program's expected life cycle, and there was great uncertainty about future costs.

After Yucca Mountain was designated in 1987 as the only site the Department could consider, the Department estimated costs, and assessed fee adequacy, using assumptions specific to that site. Thus, the FY 2008 assessment assumed a program life cycle until 2129. The total estimated program cost was $97 billion, including historical costs since 1983; that also included anticipated defense-generated waste disposal costs for which petitioners are not responsible.[7] Construction authorization was anticipated in 2011, operations – the point when the greatest expenditures would be incurred – were to start in 2020, and emplacement of waste was to end in 2069, by which point 71 percent of all future costs would have been incurred.[8] Using a

---

[7]The Act originally provided that the federal government would pay the costs of defense-generated nuclear waste directly into the Nuclear Waste Fund. However, Congress in 1993 changed that requirement to instead establish a separate Defense Nuclear Waste Disposal appropriation. That appropriation is administered, and counted, separately from the Nuclear Waste Fund; to date, it has a balance of $3.7 billion. Since FY 2011, however, the federal government has not made any requests for appropriations to cover the costs associated with disposal of this waste.

[8]After emplacement ends, the repository would remain in operation for another fifty years for decommissioning and monitoring in preparation for closing.

cash flow analysis (adding expected fee and investment income and subtracting estimated costs for each year from 2008 to 2129), the assessment concluded that the fee was certainly adequate because most scenarios showed the Fund would have a positive balance in 2129. No downward adjustment was deemed warranted, however, because the Secretary did not see compelling evidence it was appropriate – the analysis from a single year, the Secretary suggested, would not be enough to make a judgment.

After the Administration abandoned Yucca Mountain in 2009, the Secretary apparently did not issue a fee evaluation or determination that fiscal year, but the Department did announce that all the fees being paid by civilian nuclear generators and owners were still considered "essential" to meet the government's waste disposal obligations. The Secretary's inaction gave rise to an initial suit by petitioners dismissed as moot only when, after briefs were filed, the Secretary issued the 2010 determination, the subject of this suit. It stated that the Secretary would *not* propose an adjustment of the fee based on an enclosed memorandum from the Director of the Office of Standard Contract Management. That memorandum, although affirming that the Department was committed to disposing of civilian waste and that the fees needed to cover all future program costs, did not identify any of those costs, nor did it mention expected revenues. Instead, it stressed the Secretary's discretion in reviewing fee adequacy, and concluded that "we are aware of no evidence that would provide a reasoned and sound basis for determining that excess or insufficient revenues are being collected for the costs for which the Department is responsible." It noted that the Blue Ribbon Commission had not yet made any recommendations about future disposal methods. The Director added that, in any event, the current fee was adequate because, using Yucca Mountain as the best available proxy, the most recent estimate of its life cycle cost (in the FY

2008 assessment) was "$97 billion," and the fee had previously been deemed adequate based on that estimate.

## II.

Petitioners argue that the Secretary violated his statutory obligation to annually "evaluate whether collection of the fee will provide sufficient revenues to offset . . . costs" because he neither conducted a cost evaluation nor accounted for the disposal program's uncertain schedule. They also object that the Department's alternative approach, using Yucca Mountain to estimate future costs, was arbitrary and capricious (violating the APA) in light of the Department's unequivocal decision to discontinue use of that site. Petitioners contend that any validly conducted fee adequacy review would require the Secretary to find the current fee excessive, and therefore it should be adjusted to zero. Now that Yucca Mountain has been terminated, the program's future course is uncertain and no costs can be quantified. Accordingly, petitioners seek an order directing the Secretary to determine that the fees be suspended pending development of a new waste disposal program and to submit that determination to Congress.

The government responds that the Act's only requirement is that the Secretary review the fee annually; he has complete discretion as to the manner in which he identifies and evaluates costs. And if, in his judgment, there is insufficient information available to determine the fee is either insufficient or excessive, he is not obliged to call for an adjustment. According to the government, that is the situation here. As a fallback, the government insists that Yucca Mountain's costs can be used as a continuing proxy, and thereby justifies the Secretary's failure to make any new evaluations of potential costs juxtaposed against revenues.

Although the government contends that its statutory interpretation is the obvious one, it also asserts that even if we regarded the language as ambiguous, we should afford it *Chevron* deference, which leads to an argument as to whether *Chevron* deference is warranted. We think it unnecessary to resolve that issue because we believe the government's interpretation is unacceptable – whatever the degree of deference afforded.

The government focuses on the statutory language requiring the Secretary to propose an adjustment "if [he] determines that either insufficient or excess revenues are being collected," arguing that this wording bestows discretion on the Secretary. There is certainly some discretion given to the Secretary in the *manner* in which he calculates costs, but the government's argument suggests the Secretary has no affirmative obligation to conduct the sort of inquiry and analysis done in the past. He may, like an ostrich, put his head in the sand; so long as he is unaware of any information that questions the existing fee structure, he is not obliged to propose an adjustment. That interpretation is farfetched, almost absurd. It ignores the preceding sentence, obliging the Secretary "to evaluate whether the collection of the fee will provide sufficient revenues" to offset program costs. That plain language utterly destroys the Secretary's claim that he can remain entirely passive and only act if some *deus ex machina* were to bring him information.

The Secretary's alternate justification, that he can continue to rely on the FY 2008 assessment's cost calculations for Yucca Mountain as a proxy, fares no better. It is unreasonable (therefore arbitrary and capricious) to so blithely rely on a proxy that the Department itself has deemed unworkable. The Secretary has not said why Yucca Mountain was rejected, nor has he indicated what characteristics of Yucca Mountain might make it typical of any site. Morever, to assume the validity of

Yucca Mountain's cost estimate without taking into account the enormous delay in even selecting a new site ignores what the Department's own previous estimates have regarded as a critical aspect of fee adequacy – the timing of costs. The FY 2008 assessment assumed construction would begin in 2011 and operations would start in 2020. That schedule would have resulted in major near-term expenditures, and therefore a reduction in interest earned by the Fund. If these expenditures are to be pushed far back – which the Secretary must assume – he must compare them against a likely significant increase in the Fund through interest accumulation.

To add to the irrationality of the Department's choice of Yucca Mountain as a proxy is the 2010 determination's estimation of the life cycle costs of Yucca Mountain – i.e., $97 billion. The government's brief emphasized that that cost is "nearly four times" the balance in the Fund. Unfortunately, and somewhat embarrassingly, this figure is obviously inflated. As the Department's FY 2008 determination explained, $97 billion includes amounts that the Fund (and, therefore, petitioners) need not cover. Those amounts include program costs already paid, as well as the costs of disposing of waste the government generated from defense-related activities. Indeed, expected future costs are $82.5 billion, of which, according to the FY 2008 assessment, only 80 percent ($66 billion) stems from expected civilian waste disposal costs. In other words, the government submits to us a calculation that appears to be off by $30 billion – which, even today, is real money. Assuming that the Fund continues to accumulate interest at its present rate, rudimentary calculations suggest the Fund could reach $66 billion in less than twenty years – i.e., well within the range of time the Blue Ribbon Commission estimates it would take to even designate a new site – even if no new fee revenues were added after 2011.

Moreover, the 2010 determination is an unexplained departure from long-standing Department policy and therefore arbitrary and capricious on that ground as well. Long before the Yucca Mountain program was chosen, the Secretary, as we have noted, ran rather sophisticated evaluations of the potential costs of a hypothetical repository as part of his policy of conducting a "thorough analysis." His 2010 determination falls far below the Department's own previous standard. Of course, it may well be that, despite the public statements, the Department and the Administration really believe that it will eventually turn back to Yucca Mountain, but if that is so, it must be acknowledged.

\* \* \*

In sum, we readily conclude that the Secretary's determination is legally inadequate. Which brings us to the remedy. Petitioners ask us to order the Secretary to determine that fees should be suspended unless and until a new disposal program is commenced, and that, in accordance with the statute, such a determination should be submitted to Congress.

As we have noted, the Act, as originally enacted, antedated *INS v. Chadha* and provided that any fee adjustment by the Secretary had to be submitted to Congress for 90 days, where it could be defeated by a one-house veto. The Eleventh Circuit held, as it was obliged, that that procedure was unconstitutional, and that the remedy was to read the Act to say that if the Secretary were to make a determination that the fee was either excessive or inadequate, he should submit it to Congress, to become effective within 90 days of submission (which is not much different than any agency action). *See Ala. Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300, 1306-08 (11th Cir. 2002). Interpreting an analogous statute, we have taken essentially the same position on remedying similarly defective statutes. *See Alaska Airlines v. Donovan*, 766 F.2d 1550 (D.C. Cir. 1985).

13

With the one-house veto no longer in the picture, we think our authority to review the Secretary's 2010 determination under the Administrative Procedure Act includes the power to direct the Secretary to suspend the fee.[9] But it is premature to do so now. It is appropriate for us simply to declare that the Secretary's determination is legally defective and to remand. However, we are mindful that petitioners were obliged to first file suit in October 2010, in light of the Secretary's failure to conduct any fee adequacy determination since FY 2008. It was only after initial briefing was submitted that the Secretary issued his 2010 determination, thereby rendering the initial case moot. In light of that Departmental disposition to delay, we will order the Secretary to respond to the remand within six months of the issuance of the mandate and this panel will retain jurisdiction.

*So ordered.*

---

[9]Of course, notwithstanding any decision we would make, the Secretary, while complying with any order of the court, would also be free to advise Congress as he wished.